```
 1                 IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEW JERSEY
 2                    Civil No. 2:16-cv-01118-CCC-JBC


 3
        IMMUNEX CORPORATION;            :
 4      AMGEN MANUFACTURING, LIMITED;   :
        and HOFFMAN-LaROCHE INC.,       :
 5                                      :
                  Plaintiffs,           :
 6                                      :   TRANSCRIPT OF PROCEEDINGS
                      v.                :        - TRIAL -
 7                                      :        AM SESSION
        SANDOZ INC.; SANDOZ             :
 8      INTERNATIONAL GMBH; SANDOZ      :
        GMBH,                           :
 9                                      :
                  Defendants.           :
10      - - - - - - - - - - - - - - -x


11
                                       Newark, New Jersey
12                                     September 24, 2018


13


14      B E F O R E:

15                     THE HONORABLE CLAIRE C. CECCHI,
                        UNITED STATES DISTRICT JUDGE
16


17
        Pursuant to Section 753 Title 28 United States Code, the
18      following transcript is certified to be an accurate record as
        taken stenographically in the above entitled proceedings.
19


20      S/WALTER J. PERELLI


21


22
        WALTER J. PERELLI, CCR, CRR
23      Official Court Reporter


24


25
```

```
 1     A P P E A R A N C E S:

 2          WALSH PIZZI O'REILLY FALANGA LLP
            BY:  LIZA M. WALSH, ESQ.
 3               MARC D. HAEFNER, ESQ.
                 COLLEEN M. MAKER, ESQ.
 4               - and -
            SIDLEY AUSTIN LLP
 5          BY:  VERNON M. WINTERS, ESQ.
                 DAVID T. PRITIKIN, ESQ.
 6               STEVEN J. HOROWITZ, ESQ.
                 SUE WANG, ESQ.
 7               JEFFREY P. KUSHAN, E SQ.
            Attorneys for Plaintiffs Immunex Corporation and Amgen
 8             Manufacturing Limited

 9          J. DREW DIAMOND, ESQ.
            Amgen Corporate Counsel
10

11          GIBBONS P.C.
            BY:  CHARLES H. CHEVALIER, ESQ.
12               - and -
            WILLIAMS & CONNOLLY LLP
13          BY:  AARON MAURER, ESQ.
            Attorneys for Plaintiffs Hoffman-LaRoche, Inc.
14

15
       A P P E A R A N C E S (cont'd):
16
            HILL WALLACK LLP
17          BY:  CHRISTY L. SAVERIANO, ESQ.
                 - and -
18          WINSTON & STRAWN LLP
            BY:  MAUREEN L. RURKA, ESQ.
19               GEORGE C. LOMBARDI, ESQ.
                 JULIA MANO JOHNSON, ESQ.
20               DAN H. HOANG, ESQ.
                 LOREN G. RENE, ESQ.
21               KARALENA M. GUERRIERI, ESQ.
          Attorneys for Defendant Sandoz
22
            ALSO IN ATTENDANCE:
23          Mr. Steart Watt, Plaintiffs' Representative

24

25
```

1                          I N D E X

2
            WITNESS                 DIRECT    CROSS
3           ARNE SKERRA
                By Ms. Rurka           28
4               By Mr. Winters                   68

5

6
                        E X H I B I T S
7
                    EXHIBIT              IN EVIDENCE
8           PTX-165; PTX-181; PTX-182; PTX-313;      5
            PTX-315; PTX-317; PTX-320; PTX-383;
9           PTX-390; PTX-6.14; PTX-6.280;
            PTX-6.332; PTX-6.456; PTX-7351;
10          PTX-7.416; DTX-460; PTX-748, PTX-1407

11

12

9:13A   13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                THE DEPUTY CLERK:  All rise.

 2                THE COURT:  Good morning, everyone.  Have a seat.

 3     Please good morning.  How are you?

 4                MR. RURKA:  Good morning.

 5                MR. WINTERS:  Good morning, your Honor.

 6                THE COURT:  We're on Immunex Corporation, et al versus

 7     Sandoz Inc, et al, it's Civil Action 16-1118.

 8                Let's have appearances, please.

 9                (Appearances are placed on the record by Counsel.)

10                THE COURT:  Good morning.  Thank you all.

11                Should we start with exhibits today?

12                MR. HAEFNER:  Before we even get to the exhibits, your

13     Honor, I do have a little bit of housekeeping --

14                THE COURT:  Yes, go ahead.

15                MR. HAEFNER:  -- from Friday.  I do have for your

16     Honor for the Lesslauer Volume 2 deposition, a copy of the

17     designation time report that we had been providing.
```

9:15A
```
18                THE COURT:  Good.  You can hand that up.

19                MR. HAEFNER:  So I will bring a copy up, if that's all

20     right.

21                THE COURT:  Thank you, yes.

22                MR. HAEFNER:  And then we do have an exhibit list,

23     your Honor.

24                THE COURT:  Great.

25                MR. HAEFNER:  Now, one of the exhibits that was going
```

1    to be on this list is a subject of continuing dispute.

2              THE COURT:  Which one?

3              MR. HAEFNER:  Or perhaps not.

4              THE COURT:  Or perhaps not?  Okay.  We can start the

5    day that way.

6              (Laughter.)

7              MR. HAEFNER:  So it is PTX-622, your Honor.

8              THE COURT:  What is 622?

9              MR. HAEFNER:  This is an answer to an interrogatory.

10             THE COURT:  Okay.

11             MR. HAEFNER:  And there was some confusion last night

12   at the meet/confer, it was late at night, your Honor, about who

13   was going to get back to whom about it.  So Ms. Johnson has not

14   had an opportunity --

9:17A  15             THE COURT:  Do you want to just take a moment to look

16   at it together and you can tell me what's going on?

17             MS. RENE:  Yes.  Good morning, your Honor.  We had

18   discussed it --

19             THE COURT:  Good morning.

20             MS. RENE:  -- this morning.  For the first time

21   Plaintiffs indicated a potential basis for including it, and we

22   haven't had an opportunity to look at that.  So I think what we

23   discussed was that we mutually agreed to take a look at that

24   day and revisit it later today.

25             THE COURT:  Do you want to hold onto that and we can

1      talk about it later?

2                   MS. RENE:  Yes.

3                   MR. HAEFNER:  And if we have to close the case, your

4      Honor, and Sandoz does, in fact, rest today, we will revisit it

5      at the end of the day necessarily.  But --

6                   THE COURT:  That's fine.  You can look at it today and

7      I'm sure you'll be able to come to some sort of conclusion on

8      it.

9                   MS. RENE:  All right.

10                  MR. HAEFNER:  But I'm going to cross it off for now,

11     your Honor, and pass you the remainder of the list.

12                  THE COURT:  That's fine.

13                  Is there any objection to the remainder of the list?

14                  MS. RENE:  No.

15                  THE COURT:  Have you gone through it?

16                  MS. RENE:  We've gone through it and we have no

17     objection to the remainder, your Honor.

18                  THE COURT:  Let's hear the list.

19                  MR. HAEFNER:  So the its list, your Honor, from

20     Plaintiffs is PTX-165; PTX-181; PTX-182; PTX-313; PTX-315;

21     PTX-317; PTX-320; PTX-383; PTX-390; PTX-6.14; PTX-6.280;

22     PTX-6.332; PTX-6.456; PTX-7351; PTX-7.416; and from Defendants:

23     DTX-460; PTX-748, and PTX-1407.

9:18A   24                  THE COURT:  Okay.  Any objection to the list?

25                  MS. RENE:  No objection, your Honor.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1        THE COURT:  Okay.

2        (Above recited exhibits are received in evidence.)

3        THE COURT:  If you just want to give me a little

4    preview on 622.  I know you're still thinking about it, but

5    what is the potential issue there?

6        MS. RENE:  Yes, your Honor.  So 622 is a response, an

7    interrogatory response, it hasn't hasn't been used yet with any

8    witnesses and, so we still have to take a look at that to see

9    if there's a valid basis for its admission.

9:19A  10        THE COURT:  Mr. Haefner, with respect to that, counsel

11    has indicated she's going to take a look at it but it hasn't

12    been used yet.  Is that really the assertion, is that the

13    assertion?

14        MS. RENE:  Yes, your Honor.

15        THE COURT:  Okay.

16        MR. HAEFNER:  And the argument in response, your

17    Honor, is that the answer to interrogatories is a judicial

18    admission, and under Rule 33 the answer to interrogatory rule,

19    it's admissible on its face with or without a sponsoring

20    witness.

21        THE COURT:  I'm sorry, I missed the end of what you

22    just said.

23        MR. HAEFNER:  It's admissible on its face under Rule

24    33 as an admission without a sponsoring witness.

25        THE COURT:  Without a sponsoring witness.

1          Counsel, they're certified, are they not?

2          MS. RENE:  That's right.  So we haven't had -- counsel

3     just raised that as a basis for admission this morning.  We

4     haven't had a chance to look at that.

5          THE COURT:  Take a look at it.

6          MS. RENE:  Yes.

7          THE COURT:  Okay.  Thank you.  Anything else?

8          MR. HAEFNER:  Again, just for housekeeping, your

9     Honor, we do have, after we play Dr. Alliger later today as a

10    deposition, we do have the clip reports, JTX-81, 82, and 83 to

11    move into evidence, and I'm just mentioning it now as a

12    reminder to all of to us actually do that before the close of

13    the case today.

9:21A  14          THE COURT:  Okay.

15          MR. HAEFNER:  If it closes today.

16          THE COURT:  Let's talk about the schedule.  Do we

17    think it will be closing today?

18          MR. RURKA:  Your Honor, we have a witness that we're

19    taking out of order from our rebuttal reply case, Dr. Skerra,

20    that will be going first thing this morning.

21          THE COURT:  And if I remember, it was about an hour

22    and a half.

23          MR. RURKA:  At the most.  I think it's probably about

24    an hour, maybe a little bit more but not much more so.  I'm not

25    sure how long the cross is.

1          THE COURT:  That's fine.

2          MR. RURKA:  But after that I believe that they have

3     that to finish up their case.

4          THE COURT:  What do we expect after that witness?

5          MS. WALSH:  Our goal and certainly our hope was to

6     finish today after Dr. Skerra we have Stu Watt, which we

7     believe is going to be probably about half an hour, 35 minutes

8     on direct.

9          THE COURT:  Then it looks like we have a clip after

10    that?

11         MS. WALSH:  That's correct, which is 33 minutes.

12         THE COURT:  Okay.  Anything else or is that really it?

13         MS. WALSH:  Then we will be resting at this portion of

14    it, we may have rebuttal tomorrow.  But we'll see how the day

15    goes.

9:22A  16         THE COURT:  Yes.  And in terms of tomorrow, I spoke

17    with Jacquie, I believe one witness needs a remote video clip

18    or an examination through a video.  Correct?

19         MS. WALSH:  That's correct.

20         THE COURT:  And our.

21         MS. RURKA:  The folks are working on that right now.

22    So we'll keep you posted.  It should be fine.

23         MS. WALSH:  We appreciate it.

24         MR. RURKA:  We will have one more witness after Dr.

25    Skerra, that would be Dr. DeForest McDuff, and that should be a

1    very short, maybe 20 minutes to a half hour.

2              THE COURT:  That sounds fine.  Excellent.  Thanks so

3    much.

4              Is there anything else in terms of housekeeping or

5    should we start the day?

6              MR. HAEFNER:  In anticipation of Mr. Watt's testimony,

7    we do have a dispute about that, about an exhibit that we hope

8    to do now, and there's also a dispute about a document to be

9    introduced through the deposition testimony of Dr. Arora in

10   Sandoz's case that we were intending to do now, your Honor,

11   because it would affect which clips get played.

9:23A  12          THE COURT:  All right.  Go ahead.

13             MR. HAEFNER:  Its up -- you know.

14             THE COURT:  Go ahead.

15             MR. HAEFNER:  Okay.  So as to Mr. Watt, your Honor,

16   there's a European patent.  The majority of it is in German,

17   but portions of it are in English, and then, of course, there

18   are numbers on it that indicate various things; dates, other

19   patents.  Those are in numbers, not to be flip.  But I mean,

20   they're self-evident on their case what they are.  We do not

21   have a certified translation of it.  It's not our intention to

22   discuss any portion of it that is that in German.  You know,

23   Mr. Watt is not fluent in German.

24             THE COURT:  How are you using it?

25             MR. HAEFNER:  My understand, your Honor, is it's just

```
        1    to show that it is, in fact, the thing it purports to be, in
        2    English.  It's a European Patent Office patent and, you know,
        3    the desire is to use it in the course of the evidence simply
        4    for it being this thing.
9:24A   5            THE COURT:  Okay.  But in terms of any specific
        6    examination of the contents therein, are you doing that?
        7            MR. HAEFNER:  Not of that German portions, your Honor.
        8    Yes, the claim at issue is in English, your Honor, I'm
        9    reminded, as are the various references.
       10            THE COURT:  Okay.
       11            MR. HAEFNER:  So, yes, just to repeat, there's no
       12    questioning on the areas that are in German.
       13            THE COURT:  What was that?  There's no question that?
       14            MR. HAEFNER:  No questioning will be held on the areas
       15    that are in German.
       16            THE COURT:  Okay.  Counsel.
       17            MS. RENE:  Your Honor, to provide some context for
       18    this dispute, we were first apprised of their intent to rely on
       19    this exhibit last Wednesday, and we objected on Thursday and
       20    requested that they provide us with a certified English
       21    translation for the Court's reference.  The document that they
       22    are discussing is a European patent application.  The entirety
       23    of the application is in German with the exception with one
       24    portion of the claims which appear to have an English
       25    translation related to it.  It's not a certified copy itself,
```

1        and the entirety of the patent is in German.

9:25A   2              So we raised this on Thursday during the

3        meet-and-confer and requested a certified English translation

4        of it so we can actually know what the patent is all about and

5        what's disclosed in the specification.  And the response to

6        that was that they were only discussing the claims, which I

7        think is what Mr. Haefner said this morning.

8              Our position is that it's unduly prejudicial.  Well,

9        it's not admissible under Rule 403 or 401 primarily because

10        it's unduly prejudicial.  If they're going to be talking about

11        the claims, we have no idea what is in the specification.  It's

12        very difficult for us to -- it's actually impossible for us to

13        prepare for cross-examination about what is potentially in

14        these claims without having any sort of point of reference.

15        And again, we did request the certified translation.  They

16        refused to give it to us.  We requested it again last night,

17        and again they refused to give it to us.  We also believe it's

18        a waste of the Court's time and resources.  Again, the vast

19        majority of this patent is in German.

20              And as Mr. Haefner --

9:26A   21              THE COURT:  Why is the patent half in German and half

22        in English?

23              MS. RENE:  It's a European patent so it's not actually

24        half in German and half in English, the entirety is in German.

25              THE COURT:  What portion of it is in English though?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1          MS. RENE:  The claims.

2          THE COURT:  Why are the claims in English?

3          MS. RENE:  It's a European patent application, and at

4     the end of the European Patent Applications the claims are

5     actually in German and then the claims are in English and then

6     the claims are in French.  I believe that that's just the way

7     that they are issues in Europe.  But again, the vast majority

8     of it is in German so we really don't know what the

9     specification says.  To to the extent that the witness is going

10     to be testifying about what those claims mean or anything about

11     what the patent means, we don't have the proper context for

12     that.  We also don't have a file history for this.  It was

13     never -- I don't believe that it was ever produced, certainly

14     it wasn't on the exhibit list.  So it's really impossible for

15     us to sort of determine what these things mean.

16          THE COURT:  Okay.  Yes.

17          MR. PRITIKIN:  Your Honor, I can clear up some of the

18     mystery here.

9:27A  19          THE COURT:  Yes.

20          MR. PRITIKIN:  So this is a patent that issued off the

21     same application that led to the patents-in-suit.  It's in the

22     same family.  It's part -- there was the original Roche filing,

23     the Court will recall, back in 1990, and the original filing

24     was in German, the specification.

25          Sandoz provided on the exhibit list a certified

1    translation of that.  So the claim that they don't know what

2    the German application says probably isn't quite right because

3    they've translated it themselves and they put it in the record

4    of the case, a certified translation of the specification, the

5    same specification.  And it's the application --

6          THE COURT:  Did they provide a certified copy of the

7    translation of exactly the same thing that you're offering now?

8          MR. PRITIKIN:  The specification -- they issued off

9    the same specification.

10         THE COURT:  What about beyond the specification?

11         MR. PRITIKIN:  I don't know there are differences in

12   the specification between the two.  So the patent issued, the

13   claims are in English, and they know what's in the

14   specification.  We have -- it's in the '182 and the '522.

9:28A  15      The questions that are going to be asked of Mr. Watt

16   are limited to --

17         THE COURT:  Let me get to that.

18         Was the patent in the same family translated already

19   and is that a basis for us to move upon at this point?

20         MS. RENE:  So, a patent in the same family was

21   translated.  It's the original patent, the original priority

22   patent.  However, we don't know that it has the same

23   specification as the current patent that they're trying to

24   admit.

25         If your Honor remembers, the patents-in-suit, they did

1    amend those specifications, both the '182 and the '522 were

2    amended.  We have no idea because we don't speak German, so we

3    really don't know what's in the specification.

4         We cannot independently confirm that the specification

5    of the patent that they're trying to use that's primarily in

6    German is the same as the priority specification without a

7    certified translation.

8         THE COURT:  Well, let me ask Plaintiffs this:  Isn't

9    it very -- I mean shouldn't it be pretty straightforward to get

10   a German translation of this?

9:29A 11       MR. PRITIKIN:  We already have it, your Honor, they

12   provided it.

13        THE COURT:  You're saying that's actually a different

14   patent in the same family though.  Correct?

15        MR. PRITIKIN:  But there's no indication that it was

16   ever amended.  We have the whole file --

17        THE COURT:  There's no indication it was ever?

18        MR. PRITIKIN:  Amended in German.  This all issued in

19   the European Patent Office.  We have the entire 121 file

20   history.  It was produced, this comes out of it.  It's already

21   in evidence.

22        THE COURT:  You're saying it's exactly the same?

23        MR. PRITIKIN:  As far as we know it's the same.  I

24   mean, if there was a change made you could tell from looking at

25   the file history.

1          THE COURT:  Is there any indication that there's any

2     change from what's already been translated?  Because that's

3     really the issue.

4          MS. RENE:  Right.  So my understanding is the file

5     history, that was produced and my understanding is that's in

6     German as well.  You know, so no one from -- I mean, unless

7     it's a German speaker, I can't say for sure whether or not the

8     specification was amended or not.

9          THE COURT:  Is there anyone here that speaks German

10    that could take a look at it real quick for us?

9:30A   11          MR. PRITIKIN:  Dr. Skerra.

12          THE COURT:  That's the issue.  We want to make sure

13    that what needs to be translated was translated.  But if it's

14    already been done, then we can move on to something else.  But

15    if there's something in there that you believe has not been

16    translated that's distinct, I'd like to know what it is and

17    then we can address it.

18          MS. RENE:  Sure.  You know, it's the simple fact that

19    we can't independently confirm without a certified translation.

20    And again this goes back to Wednesday.  They knew since last

21    week that they were going to be using this and they had ample

22    opportunity to provide with us a certified translation.

23          THE COURT:  Let's get back to this though.  The claims

24    themselves, it sounds like they're in different languages,

25    they're repeated.  To the extent we're looking at, and sort of

1    keeping our thrust to those particular claims, do we need

2    anything beyond that if it appears that the thing has already

3    been translated previously?

4              MS. RENE:  I mean, the claims mean what they mean, but

5    to the extent the witness is going to be interpreting those and

6    say that they cover certain things, we believe that's improper

7    without a certified --

9:32A   8         THE COURT:  But those claims are in English, are they

9    not?

10             MS. RENE:  That's right, the claims do appear in

11   English although the translation is a little -- to use a legal

12   term, "wonky."

13             So it's a little bit difficult to read.  But again, to

14   the extent that the witness is going to be testifying as to

15   claims covering certain things, you know, without the proper

16   context it's -- we believe it's unduly prejudicial and it's

17   also not particularly useful for the Court.

18             THE COURT:  Tell me again how you're going to be using

19   this.

20             MR. PRITIKIN:  So the patent -- could I have just a

21   second, your Honor?

9:33A   22        THE COURT:  Yes.

23             MR. PRITIKIN:  Your Honor, this is one of the patents

24   that is specifically referenced in the Accord and Satisfaction,

25   Mr. Watt is going to be testifying about the Accord and

1    Satisfaction and about the rights that were granted under it,

2    and this is one of the patents that was the subject of that.

3            It is the 120 -- EP 121 patent.  It issues off the

4    same family as the patents-in-suit, part of the same file

5    history --

6            THE COURT:  Is it incorporated by reference in the

7    document that you had translated?  I mean, how is it related

8    back?  Because there's a dispute here as to whether what's been

9    translated is exactly the same thing.

10           MR. PRITIKIN:  Yes.

11           THE COURT:  How would I come to some sort of

12   conclusion on that?

13           MR. PRITIKIN:  So the original application that was

14   filed was filed, as your Honor knows, it was filed in German,

15   in Europe back in 1990.  That original application became the

16   specification of this European 121 patent.  It also became the

17   specification of the U.S. patents-in-suit.

9:34A   18        The original application that was filed in German was

19   translated by Sandoz.  They provided a certified translation of

20   that original application, which is the specification of this

21   patent.

22           THE COURT:  Is there any way to know if there were any

23   amendments though?

24           MR. PRITIKIN:  Well, one could look at the file

25   history to see if there are any but --

1          THE COURT:  Has anyone done that?

2          MR. PRITIKIN:  They're familiar with the file history.

3     They've been studying it for years.  There's no indication that

4     there's anything of any consequence that happened in the

5     European Patent Office or any amendments there after August of

6     1990, so there's no basis for raising a question as to whether

7     it's the same.

8          THE COURT:  Ms. Rurka.

9          MR. RURKA:  Your Honor, they produced this document to

10    us and we're supposed to anticipate that they were going to

11    bring a brand new document into the case last week, Wednesday,

12    and scour through the file history that's in German to figure

13    out whether or not any amendments to the specification were

14    being made?  That's what Mr. Pritikin is arguing today, when

15    all they had to do was provide a certified translated copy to

16    prove that it's the same specification.

9:35A 17          THE COURT:  Can we get a certified translated copy?

18    How difficult would that be?

19          MR. PRITIKIN:  So, I'm told that, in fact, we provided

20    the certified translation, not Sandoz.  So I stand corrected.

21    But they've had that forever, the translation of the

22    relationship application.

23          THE COURT:  But just so that this is on solid footing,

24    how difficult is it then to get a certified translated copy of

25    this?

1          MR. PRITIKIN:  I assume it can be done.  I mean --

2          THE COURT:  Why don't we just do that so then there's

3     no dispute?  And I understand what you're saying, that the

4     previous document was already translated and there's no

5     indication of any amendments and so on.  But to the extent

6     there's any dispute about any amendments, if it were certified

7     as a prosecutor translation we could just move on from it.

8          MR. PRITIKIN:  It can be done.  I'm told it would take

9     about a week to get a certified translation of it.

10          THE COURT:  Well --

11          MR. PRITIKIN:  Let me make this suggestion, your

12     Honor.

13          THE COURT:  Yes.

14          MR. PRITIKIN:  What I would propose is that we go

15     ahead, we proceed, we conduct the examination, we can get a

16     certified translation of it, we'll provide it to the other

17     side.  If they think there's some basis in there for coming

18     back or some question or discrepancy that's been raised, we can

19     figure out at that point what we would need to do.  But I hate

20     to hold up the whole proceedings for a week while we do that.

9:36A   21          THE COURT:  Although if they mentioned it last week.

22     A certified copy could have been obtained last week as opposed

23     to being discussed today --

24          MR. PRITIKIN:  For the same reason, I explained this

25     morning, we saw no reason to do that because it is the same, it

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    is the same specification that led to it.

2              THE COURT:  I understand your position.  But

3    Defendant's position is they would have to go through the whole

4    file history to determine whether there's an amendment.  And

5    your position is, they should know that.  They're here arguing

6    this case, they should know it.  But at the same point if we're

7    going to rely on that a document -- it sounds like really the

8    only thing that's in English is the claim, so that sounds fine,

9    you can address the claim.  To the extent you're going to dive

10   deep into the rest of the document, it sounds like there's a

11   challenge.

12             MR. PRITIKIN:  And I think the questions I'm going to

13   be asking about the claims are clear on the face of the claims,

14   your Honor.  If they think there's some reason to go into the

15   specification or a need to do that, certainly they can tell us

16   then.

17             THE COURT:  So I'm going to allow it in now

18   conditionally.  You're going to get us a certified copy and

19   present it to the Defendants.  If there's any issue after we

20   conclude on this, you may contact the Court and let us know and

21   we'll deal with it if we need some sort of further development

22   of the testimony.

23             Thank you.

24             MR. PRITIKIN:  That's fine.  Thank you, your Honor.

9:37A  25         THE COURT:  Thank you.  All right.  What's next?

1          MR. HAEFNER:  So in anticipation of Dr. Arora later

2     today, your Honor, in Sandoz's case, this is a deposition clip.

3     There is a dispute about a document that is included in the

4     clip.  This is Dr. Arora's resume which she specifically

5     testified at her deposition she created for the purpose of

6     getting a job.  She was not employed by Amgen --

7          THE COURT:  I'm sorry.  There's a dispute over her

8     resume?

9          MR. HAEFNER:  They want to move it into evidence, your

10     Honor.

11          THE COURT:  Okay.

12          MR. HAEFNER:  And it's hearsay.  And at the deposition

13     she, in fact, confirmed that she created it for the purosess of

14     getting a job.  It doesn't have any indicia of reliability, and

15     we don't want that exhibit to come in, nor do we want the

16     related testimony to come in.

17          THE COURT:  She could go through each thing and

18     identify what she's done, no?  And say, yes, I worked here

19     during this period of time; yes, I wrote this article; I did

20     the following research.  She would be able to do that.  No?

9:38A  21          MR. HAEFNER:  I don't believe so, your Honor.  I mean,

22     it is an out-of-court statement offered to prove the truth of

23     the matter asserted.  It's not her statements as -- it's not

24     statements about what she did at Amgen in the context of being

25     a current employee at Amgen.  It's a statement referenced to a

1    resume, a resume which is not admissible for the purpose of
2    examining the parts of the resume that are puffery and then
3    using that to construct an argument that they should be taken
4    at face value for the truth of the matter asserted.
5            And that's what we have a problem with, your Honor.
6            THE COURT:  Okay.
7            Counsel.
8            MS. RENE:  So, your Honor, the Plaintiffs' objections
9    to this include both testimony and the actual CV itself.
10           So, during her deposition, Dr. Arora was asked about
11   her CV and explained various entries in her CV, just as your
12   Honor suggested one might do doing a deposition, and those are
13   the portions that's Plaintiffs are objecting to.  And just to
14   provide the adequate context of who Dr. Arora is and why this
15   is relevant.  Dr. Arora submitted a declaration to the PTO
16   during the prosecution of the patents-in-suit regarding the
17   unexpected results relating to effector functions of CDC and
18   ADCC.
19           That declaration was relied on by Dr. Greene, who was
20   Plaintiffs' witness during his testimony.  And the testimony at
21   issue that they're objecting to specifically relates to her CV
22   and her description and her testimony about her role as a
23   scientific liaison for the legal team at Amgen.  Specifically,
24   she testified consistent with her CV that she was a scientific
25   liaison for legal teams, to tackle intellectual property

1    related matters for marketing drugs, pipeline, and emerging

2    technologies, help formulate strategy for stronger IP,

3    innovator molecules, and defensive strategy for biosimilars.  A

4    key impact was for Enbrel as setting patent protection for

5    another 16 years past its 2012 expiration date.

6            So that portion of her CV was discussed during her

7    testimony.  She explained it, she explained her role at Amgen,

8    including her role in the scientific studies relating to the

9    declaration and the purposes of the declaration.

10           THE COURT:  Okay.  Is she coming in live, or is

11   this --

12           MS. RENE:  No, this is a deposition designation.

13           And also Plaintiffs at her deposition did examine her

14   on her CV, including the purposes for her creating the CV

15   which -- to get a job, which is why most people create those

16   CVs, and they have designated that testimony, so it will be

17   played as well.

18           So from our perspective these things are not hearsay.

19   We are not offering it for the truth of the matter asserted,

20   we're offering it it to provide context for her testimony.

21   It's relevant to her testimony.  She's the one who did the

22   testing at Amgen and the Plaintiffs relied on --

9:42A  23           THE COURT:  Why wouldn't the testimony be sufficient

24   on its own without the CV?

25           MS. RENE:  They're also objecting to -- the testimony

1    might very well be sufficient on its own, but they're also

2    objecting to that testimony.

3          THE COURT:  What's the objection to the testimony?

4          MR. HAEFNER:  Two things, your Honor.  There's no

5    objection to the testimony about her work on the declaration,

6    about her interaction with the Patent Office.  The concern is

7    that then when one turns to the CV created for the purposes of

8    getting a job and obviously glossed in a manner that would make

9    her an attractive candidate, one sees this language which was

10   read to you about how she was, you know, assisted in extended

11   patent life, et cetera, et cetera.

12         You know, this is not what her job was at Amgen.  She

13   testifies about in the designations about what her job was,

14   what she did on a daily basis.  There's no objection to that.

15   The objection is to the spin on, let's use your CV to now

16   create this narrative, a CV which is hearsay to create this

17   false setting.

9:43A   18        THE COURT:  But during the clip I imagine you cross

18
19   it, don't you?

20         MR. HAEFNER:  There is testimony, your Honor, which

21   I'm not positive got into the final clip, so there does have to

22   be a discussion off line about these lines.  But, yes, there is

23   testimony about how the CV is specifically for the purpose of

24   obtaining a job.

25         THE COURT:  Okay.  Well, this is what I'm going to do

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    on this:  I'm going to allow it so I can listen to it and see
2    how it fits into the testimony.  But I am very cognizant of the
3    objection, and I'm going to take a further look at it.  So it's
4    conditionly admitted at this point, and I may allow it in or
5    may not allow it in depending upon how things go.  All right.
6    Thank you.

7            MS. RENE:  May I just make one more note on that, your
8    Honor?

9            THE COURT:  Yes.

10           MS. RENE:  Thank you.  I appreciate it.

11           As I stated before, we don't believe that it's being
12   offered for the truth of the matter as the resulted.  But even
13   if it was offered for truth of the matter asserted we believe
14   that it falls within -- it's admissible subject to Federal Rule
15   of Evidence 807 under the residual exception to the rule
16   against hearsay.  Dr. Arora testified that the document is
17   indeed her curriculum vitae.  She reflected circumstantial
18   guarantees of trustworthiness, and as your Honor will hear from
19   the clip, she did explain if fully.  So I just wanted to note
20   if for the record as well.

9:44A  21        THE COURT:  I'm curious to see how the testimony
22   stands on its own without the resume.  I'm not certain at this
23   point because I'm listening in advance of hearing it, how
24   intertwined it actually is.  Have you folks taken another look
25   at this?

1           MR. HAEFNER:  Your Honor, I don't believe, your Honor,

2     that the that portions of the deposition which deal with the

3     facts of the case are intertwined with this discussion of her

4     CV and the gloss she had put on on it.

5           And as to the 403 -- or excuse me -- the 807 --

6           THE COURT:  807.

7           MR. HAEFNER:  -- exception, she admits in the

8     deposition itself that its for the purposes of getting a job.

9     And as anyone who has made a CV or resume knows, that is not an

10    indicia of reliability.

11          (Laughter.)

12          MS. RENE:  I don't know if I would agree with that.

13          THE COURT:  All right.  Let's move on from that.

14          MS. RENE:  Thank you.

15          THE COURT:  What's next?

16          MR. HAEFNER:  There's nothing at the moment, your

17    Honor.  There's a brewing discussion of documents related to

18    Dr. McDuff, but all or portions of it may be worked out, and so

19    we're just going to hold --

9:45A 20    THE COURT:  So hold on that if you're still having a

21    conversation regarding it, that's fine.

22          Anything else?

23          MR. HAEFNER:  Let me --

24          THE COURT:  Look through your notes.

25          MR. HAEFNER:  That is it, your Honor.

```
 1                    THE COURT:  Sounds good.  Anything else?
 2                    MS. RENE:  No, that's it, your Honor.  Thank you so
 3      much.
 4                    THE COURT:  Thank you very much.  Let's move on then.
 5                    MR. RURKA:  Your Honor, we call Professor Arne Skerra.
 6                    THE COURT:  Thank you very much.
 7                    You may come forward.
 8                    MR. RURKA:  I believe you have the binders.
 9                    THE COURT:  Good morning, sir.  You may come forward.
10      Thank you.
11                    We'll have the witness sworn in.
12                    MR. RURKA:  May I approach?
13                    THE COURT:  Certainly.
14                    How are you, good morning?
15                    DR. SKERRA:  Good morning.
16
17      A R N E   S K E R R A, called as a witness, having been first
18          duly sworn, is examined and testifies as follows:
19
20                    THE DEPUTY CLERK:  Please be seated.  State your name
21      for the record.
22                    THE WITNESS:  My name is Arne Skerra.
23                    THE COURT:  Try it again.  You can speak right in.
24      Just say "test."
25                                    DIRECT EXAMINATION
```

9:46A (line 23)

1    BY MR. RURKA:

2    Q    Good morning, Professor.

3    A    Good morning.

4    Q    Could you please state your name for the record?

5    A    Arne Skerra.

6    Q    And, Professor Skerra, what is your current occupation?

7    A    I'm a full Professor at the Technical University of Munich.

8    Q    And what is the Technical University of Munich?

9    A    Now in Germany a technical university is a kind of

10   university which is devoted to the natural sciences and

11   engineering as opposed to philosophical sciences, and among the

12   German technical universities, I think the Technical University

13   of Munich is one of the leading universities.

14   Q    Thank you.

15        Can you provide, describe your work at the Technical

16   University of Immunology?

9:47A  17   A    Yes.  I'm a professor of biological chemistry, and I teach

18   biological chemistry in various flavors.  That means I hold my

19   chemistry courses at the undergraduate level, and more

20   specifically, I teach protein biochemistry at the masters level

21   and graduate level.  And in addition, I work in research, so my

22   laboratory hosts approximately 25 co-workers, and we are

23   working on several topics in the area of protein design and

24   protein biochemistry.

25   Q    And, Doctor, is this your first time testifying at trial?

Sferra - Cross - Rurka

1     A    Yes.

2     Q    Okay.  And, generally, you're providing expert testimony

3     today.  Can you give a general overview of the topic you're

4     your testimony is directed to?

5     A    I was asked to provide my opinion about the way how

6     etanercept interacts or binds to TNF.

7     Q    Okay.  Did you bring your CV to court today?

8     A    Yes, I did.

9:48A    9     Q    Can we please turn to DTX-1249.

10    A    That's my CV, yes, so the first page of it.

11    Q    Did you prepare some slides to help the Court today?

12    A    Yes, I did.

13    Q    All right.  Why don't we put them on the slides for that.

14         MS. RURKA:  So let's go to DTX-3001.  And can you

15    describe your education for the Court, Doctor?

16    A    Yes, I accomplished chemical studies at the Technical

17    University of Darmstadt and completed my studies with a degree

18    of a chemical engineer, and this was at the end of '85; and in

19    the beginning of '86, I moved to the Ludwig Maximilians

20    University of Germany -- of Munich -- sorry -- which is the

21    other big immunology university, and there I did my Ph.D work,

22    and I worked on the topic of "Functional Expression of Antibody

23    Fragments in E.coli," which is a common laboratory material;

24    and I finished my Ph.D studies with the German equivalent

25    degree of the US Ph.D, at the end of '89.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skerra - Cross - Rurka

9:50A    1    Q   What was the subject matter of your Ph.D research, Doctor?

         2    A   As I mentioned, I worked on antibodies and antibody

         3    fragments, the way how they can be produced in the laboratory

         4    bacteria, how they can be purified and their binding can be

         5    investigated.

         6    Q   Okay.  Let's turn to DTX-3002.  And can you describe what

         7    you did after completing your graduate research?

         8    A   Yes, certainly.  So in the beginning of the year 1990, I

         9    went to England and to the Medical Research Council Laboratory

        10    of Molecular Biology in Cambridge and joined Dr. Milstein's

        11    department; and one year later I received a position as a group

        12    leader back in Germany at the Max-Planch Institute for

        13    Biophysics in Frankfurt; and in '94, I received my first

        14    appointment as an Associate Professor of Protein Chemistry at

        15    the Technical University of Darmstadt; and finally, in '98, I

        16    received my present appointment, that is the full Professorship

        17    in Biological Chemistry at the Technical University of Munich.

9:51A   18    Q   How long have been you be conducting research in the field

        19    of biological chemistry, Doctor?

        20    A   I think that kind of research started early in my Ph.D

        21    thesis, so it is now more than 30 years.

        22    Q   Have you published articles over the course of your career?

        23    A   I have.  I would say more than 200 articles, both basic

        24    research articles or original research articles, and reviews

        25    and book chapters.


WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1     Q    Let's go to DDX-3003.  Have you been a member, held
2     leadership positions within your field?
3     A    Yes.  I have been a member of the German Chemical Society
4     for more than 30 years, and there I served as an elected board
5     member, and for a couple of years also as a Chairman of their
6     division called Biochemistry.  Also I have been a member of the
7     German Society of Biochemistry and Molecular Biology, GBM, and
8     there I have served as a Chairman of their study group, Protein
9     engineering And Design.

10         Apart from my scientific interests, I was also
11    interested in translating my research into practical
12    applications, and over the years I have co-founded two
13    companies, two biotech companies with the goal of developing
14    biopharmaceutical drugs.  And the first one is Pieris, which by
15    now is called Pieris Pharmaceuticals, Inc., in fact, it's
16    listed on the NASDAQ companies the last couple of years, and
17    the other companies is XL-Protein, GmbH.

9:52A 18   Q    Doctor, are you the member of any editorial boards?
19    A    Yes.  I have been serving on the editorial board for the
20    editorial advisory board of several international scientific
21    journals, among those, the Journal of Molecular Biology; the
22    journal called Protein Engineering Design and Selection, and
23    some others.
24    Q    Okay.  And have you received any professional honors or
25    awards?

1    A    Yes.  Over the years I was lucky to receive a couple of

2    awards.  Among those, for example, is my election as a full

3    member to the German Academy of Science and Engineering; I also

4    received some medals and prizes, both in Germany, for example,

5    the Heinz Maier-Leibnix medal, but also internationally.  So,

6    for example, I won the Universal Biotech Prize of Innovation in

7    Paris, France; and also in the U.S. I led a team that received

8    the -- or that was awarded as grand prize winner in the

9    International Genetically Engineered Machines competition which

10   took place in Cambridge, Massachusetts.

9:53A  11            MR. RURKA:  Your Honor, defendants would proffer Dr.

12   Skerra as an expert in the field of biochemistry, protein

13   chemistry and chemistry -- I'm sorry -- protein biochemistry

14   and chemistry.

15            THE COURT:  Thank you.

16            Any objection?

17            MR. WINTERS:  There will be some cross-examination in

18   this area, but no objection to his admission as so moved, your

19   Honor.

20            THE COURT:  Thank you so much.

21            So he is deemed to be an expert in these areas and he

22   may so testify.

23            MS. RURKA:  Thank you, your Honor.

24            THE COURT:  Thank you.

25            MS. RURKA:  Let's turn to DTX-3005.

Skerra - Cross - Kurka

1    Q    And can you just offer a general road map of the opinions
2    you'll be offering today?
3    A    Yes.  As I already mentioned, I was asked to provide my
4    opinion on the properties of etanercept and their interaction
5    or binding to TNF.  The first opinion is on the topic:
6    Etanercept's strong TNF-binding is not unexpected;
7              The second opinion is:  Etanercept's lack of
8    aggregation is not unexpected; and
9              Third, etanercept's role in CDC and ADCC is not
10    unexpected.
9:54A  11    Q    Okay.  Let's turn to DTX-3006, and talk about the
12    perspective that you applied when you did your analysis.
13              You're aware that Dr. Blobel offered an opinion on who
14    is a person of skill in the art?
15    A    Yes, I do.
16    Q    Okay.  And DDX-3006, you understand this is the definition
17    he applied?
18    A    Yes.  Dr. Blobel expected from a person of ordinary skill
19    in the art, he had an MD or Ph.D in biology, molecular biology,
20    biochemistry, or chemistry or a similar field.
21              In fact, my Ph.D is in the field of biochemistry.
22              And this person should have one to two years of
23    experience in the field of immunology or molecular immunology,
24    and some other techniques which I -- at least part of them I
25    was well aware at the time.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Sheria - Cross - Rurka

1    Q    Okay.  And did you conduct -- did you have one to two years

2    of experience in the field before the priority date?

3    A    Yes.  So in particular, both during my Ph.D thesis and at

4    the time thereafter at Cambridge I worked on protein

5    biochemistry, protein purification, I was familiar with

6    immunological assays, and I was experienced in cloning and

7    expression of DNA.

9:56A  8    Q    So, in your opinion, are you qualified as a person of

9    ordinary skill in the art as of August 31st, 1990?

10    A    Yes, I believe so.

11    Q    Okay.  Let's turn to DDX-3007, and we'll start with your

12    first opinion that:  Etanercept's strong TNF-binding is not

13    unexpected.

14         And before we get into the meat of your testimony, why

15    don't we talk about some concepts and terms that will be

16    relevant for your testimony.

17         So let's go to DDX-3008.  And, Doctor, can you just

18    talk through what a TNF trimer is and what that means?

19    A    TNF is a cytokine.  That means it's a signaling protein in

20    the immune system, and its structure was elucidated by Eck and

21    Sprang and shown in the publication of '89.  And he received

22    one picture from the publication.  And here we see a kind of

23    trace which is meant to illustrate the chain of amino acids

24    that forms this protein.

25         And it's a bit difficult to see here on this slide

1    but, in fact, there are three different traces:  One shown in

2    red, one in light blue, and one in light green.  And this

3    indicates that TNF is a trimer of three identical chains of

4    amino acids.

9:57A   5         Now, for the following of my talk I will use a more

6    simplified representation which is shown to the right where we

7    see, let's say, three egg-shaped objects.  These should stand

8    for the polypeptide chains, and I will also refer to them as

9    the three subunits of the TNF trimer.  And all three subunits

10   are mutually identical.

11   Q    By "mutually identical," what does that mean for

12   TNF-binding?

13   A    It means the expectation is that there are three binding

14   sites because each subunit offers one binding site for the

15   receptor.

16        MS. RURKA:  And just for the record, the Eck and

17   Sprang article, that's JTX-26 at page 4.  That's where the

18   image comes from.

19   Q    Okay.  Let's turn to DDX-3009.

20        And why don't we talk through what you're showing

21   here.  We have two different figures.  And can you explain what

22   those are?

23   A    Yes.  These figures are schematic representations of the

24   molecular structure of etanercept.  So on the left we see here

25   in green -- so, first of all, etanercept is a dimeric protein

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skerra - cross - Rurka

1    so it is composed of two identical chains of amino acids.  And

2    in the upper part, the green moiety, this represents the

3    extracellular portion of the TNF receptor; the dark blue moiety

4    at the bottom, that's the CH2 and CH3 regions or domains of an

5    immunoglobulin; and in the middle, the light blue part, that's

6    the hinge region which also has cysteine residues and disulfide

7    bridges.

9:59A  8        Now, on the right we see a slightly more detailed

9    picture as it was used by expert Dr. Greene, so in principle it

10   looks the same.  It has a bit more granularity on the

11   extracellular portion of the TNF receptor, which is also known

12   as p75 receptor.  And here we actually see what was known from

13   the literature, that this extracellular region forms four

14   domains which are linked by more or less flexible linkers.

15       At the time it was not known where the binding site

16   for TNF is, it was not clear whether it's on the tip of this

17   receptor moiety or maybe on the side of one of its domains.

18   But for the protein biochemist such a picture makes already

19   clear that this TNF receptor has a certain degree of

20   flexibility so it would allow the TNF to approach in several

21   ways.

22   Q   Okay.  And by the "domains," those are depicted in Dr.

23   Greene's pictures as the blobs?

10:00A 24   A   Yes.

25   Q   Is that accurate?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1        And connected by little amino acid chains.  Is that
2    right?
3    A   Stretches of amino acids which probably are flexible.
4    Q   Okay.
5    A   But for the following, I will refer for simplicity to the
6    left picture.
7    Q   And, Doctor, before we continue, you prepared an expert
8    report in this case.  Is that right?
9    A   Yes.
10   Q   And you were asked to make an assumption about what the TNF
11   receptor portion of etanercept looks like.  Is that right?
12   A   Yes.
13   Q   Okay.  And you understood at the time that the full TNF
14   receptor extracellular region has 235 amino acids.  Is that
15   right?
16   A   Yes.
17   Q   There was a typo in your expert report.  Isn't that right?
18       MR. WINTERS:  I'm sorry, your Honor.  That's quite
19   leading.  There's a paragraph --
20       THE COURT:  Rephrase it.
21       MR. RURKA:  Yes.
10:01A 22   Q   What did your expert report state about the extracellular
23   region of the TNF receptor in etanercept?
24   A   I was -- there were two numbers given to me as a basis of
25   my opinion.  I believe it was 275 residues or 185 residues.

1      But the actual number did not really play a role for my opinion
2      because it was so important for me to see that all these four
3      domains are present in this extracellular portion.
4            So my assumption was that this was a biologically
5      active extracellular region of a receptor, it has a certain
6      structure, it has obviously the binding sites for TNF-alpha,
7      and this is the situation under which I then imagined how such
8      a soluble version, such a fusion protein of the TNF receptor,
9      would interact with TNF.
10     Q    Okay.  Thank you, Doctor.
11           Let's go to DDX-3010.  Have you reached an opinion
12     about the expected binding in 1990, of what a person of skill
13     in the art would have expected a molecule like etanercept, how
14     they would have expected it to bind to TNF?
10:02A 15     A    Yes, that's actually my opinion.  If I imagine, if what I
16     know, or what I would have known at the time about the
17     structure of etanercept on the one hand and the trimeric
18     structure of TNF on the other, then I would have assumed or
19     expected that etanercept would form this kind of one-to-one
20     complex as I would call it, where each arm of etanercept, so
21     each extracellular receptor, will bind to one subunit on TNF.
22     That means two subunits of TNF occupied, the third subunit
23     remains unoccupied except for certain circumstances which we
24     may discuss later.
25     Q    Okay.  So let's turn to DDX-3011.

1          And what we have here, Doctor, is a slide from Dr.

2    Naismith's presentation.  Did you read Dr. Naismith's

3    testimony?

4    A    I have read that part of his testimony that refers to the

5    topic here.  I have seen the slide and the slide looks familiar

6    to me.

10:03A   7    Q    Okay.

8    A    Because this is a very generic illustration how in

9    principle a biovalent binding protein -- and I don't think we

10   see here already a distinction, whether this would be an

11   antibody or it would be etanercept.  It's a very general

12   illustration how a biovalent binding protein could interact

13   with a trimeric antigen like TNF.

14   Q    So why don't we talk about the three modes.  What is Mode

15   1?

16   A    Yes.  In Mode 1 we see that each arm, each binding arm of

17   the binding protein binds to one subunit the TNF, and these are

18   two separate TNF trimers.  So this is called a monovalent

19   binding because each arm binds to one TNF trimer independently

20   of the other arm.

21   Q    How about, Mode 2?

22   A    Now, Mode 2, that would be called bivalent binding because

23   we see that one arm, again, binds to one subunit of the TNF

24   trimer, but the other arm of the molecule binds to a different

25   subunit part of the same TNF trimer.  So both particles, the

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    TNF and the binding protein, are connected by two bonds, and

2    this is why we call it bivalent binding.

3    Q    And how about Mode 3?

10:04A  4    A    Mode 3 is maybe a more simplified version of Mode 1, where

5    just one arm of the bivalent binding protein binds to one

6    subunit the TNF trimer.

7    Q    Okay.  So let's go to DD-3012 and talk about Mode 3 first.

8         What is your opinion about Dr. Naismith's -- the role

9    of binding Mode 3?

10    A    Now, compared with Mode 1 and Mode 3 -- Mode 2, -- excuse

11    me -- Mode 3 is, in my opinion, more kind of transient or

12    intermediate state because this would be the first complex that

13    is formed when the bivalent binding protein encounters the

14    trimer TNF.  Of course, naturally one arm would first bind to

15    one subunit on the TNF trimer and we arrive at Mode 3.

16         But, in my opinion, the process doesn't stop here,

17    because now the molecule has essentially two options how to

18    react further.  And one option would be to use its second arm.

19    So the bivalent binding protein would use its second arm to

20    engage with a second subunit on the same TNF trimer.  So this

21    would in the end lead to Mode Number 2; or alternatively, if

22    there are additional copies of TNF present, then the same arm

23    could potentially bind to another TNF trimer and then we arrive

24    at Mode Number 1.

10:06A  25    Q    Between Mode Number 1 and Mode Number 2, which binding mode

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1     would be preferred, or would be expected to be preferred?

2     A    Now, in my opinion, Mode Number 2 would be strongly

3     preferred, and this would be the default mode of binding.

4     Q    Okay.  Let's turn to DDX-3013 and talk about why Mode 2

5     would be preferred.

6           What we have up here is DTX-84, which is the Roitt

7     textbook, Doctor.  Is that right?

8     A    Yes.

9     Q    And this is on page 5.  And can you talk to us about what

10    Roitt terms us about bivalent binding and monovalent binding?

11    A    Yes.  So Dr. Ivan Roitt wrote a famous textbook on

12    immunology which I also used during my Ph.D thesis and which I

13    still have on my shelf today, and in his textbook he explains

14    the so-called avidity effect, and he also explains the

15    difference between avidity and another phenomenon called

16    affinity.  And affinity, that's, let's say, a simpler version.

10:07A 17          Now, he says in the explanation of this table, which I

18    will come to in a moment, his statement is:  Multivalent

19    binding between antibody and antigen (avidity or functional

20    affinity) results in a considerable increase in stability as

21    measured by the equilibrium constant, compared to simple

22    monovalent binding (affinity or intrinsic affinity).

23          So that's a very fundamental statement which is

24    illustrated in the table.

25    Q    Okay.  And so multivalent, is that the same as bivalent in

```
         1    this context?

         2    A    Multivalent is the more general expression.  Bivalent in

         3    principle, they are also binding like bivalent and so on.  But

         4    bivalent is the simplest mode of multivalent binding.

         5    Q    And this textbook references antibodies.  Does this table

         6    apply, or the concept of the affinity and avidity apply beyond

         7    antibodies?

10:08A   8    A    Of course this is a textbook on immunology so it focuses on

         9    antibodies and antibody-like molecules.  And this is also why

        10    there's divisions at the top, at the top that are referred to

        11    antibodies.  But the fundamental principle of avidity applies

        12    to any kind of bivalent binding protein.

        13    Q    So let's turn to DDX-3014, and take a look at Dr.

        14    Naismith's binding modes.  And let's talk first talk about

        15    binding Mode 3.

        16         Does Roitt have a column for what would represent

        17    binding Mode 3?

        18    A    Yes.  Now, in this column, Dr. Roitt actually distinguishes

        19    four different cases, and I will now discuss the relevant cases

        20    here.

        21         Column number two -- unfortunately, the battery is

        22    empty.

        23    Q    Oh.

10:09A  24         (Batteries for laser pointer are handed up to

        25    Witness.)
```

1          MR. RURKA:  Thank you, Mr. Haw.

2     Q    Now, column number three in this table illustrates a

3     situation where an antibody -- and this is this Y-shaped

4     molecule or protein at the top -- interacts just with one of

5     its two arms which are also known as FAB arms for the antigen

6     binding fragment, which is shown here as a small particle.  And

7     this is essentially the same situation as illustrated in the

8     Mode Number 3 which I discussed before.  So here the bivalent

9     binding protein interacts with one antigen particle, one TNF

10    trimer.

10:11A 11          And this table characterizes this situation as a

12    normal affinity direction.  And "affinity" means its strengths

13    of binding.  And it says the number of valence is 1, so it's

14    multivalent binding, and it gives here a certain equilibrium

15    constant which is arbitrarily chosen as 10 to the 4.

16    Q    Okay.  And I think you said "multivalent" binding.  Did you

17    mean "monovalent" binding?

18    A    I'm sorry.  I meant monovalent binding.  So univalent,

19    monovalent binding.

20    Q    Let's take a look at Binding Mode 1.  And what would

21    Binding Mode 1, where would Binding Mode 1 fall in this chart?

22    A    Mode 1 would fall into the same category.  Because as I

23    explained before, each arm of the bivalent binding protein

24    independently interacts with one antigen particle -- here it

25    would be the TNF trimer -- independently of the other arm.  So

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    again we have a situation here which is characterized by the

2    term "affinity," and it's characterized by the term "monovalent

3    binding."

4    Q    Okay.  And so let's go to slide DDX-3015.  And where does

5    Mode 2 then fall within this chart?

10:12A   6    A    Now, Mode 2 is definitely a different mode of binding

7    according to the classification by Dr. Roitt.  Because here

8    this situation resembles column number 4.

9            So here at the top we see an antibody that is now

10   engaged with both of its arms.  So both arms of the Y bind to

11   an antigen, but these antigens are part of one particle.  And

12   here in the context of immunology, this looks more like a cell

13   surface or maybe a virus surface.  But the fundamental

14   principle is here that the antigenic sides are part of one of

15   the same particle.  And this would also be possible -- sorry --

16   that would also be the situation for the three subunits of one

17   TNF trimer.

18           So Mode 2 clearly corresponds to this column here on

19   the table.  And now we see that this kind of interaction is

20   characterized by the term "avidity."  So that's this special

21   situation which is strongly favored.

22           And this can be seen from the value of the equilibrium

23   constant which is now 10 to the 7.  So simply dividing 10 to

24   the 7 by 10 to the 4 means we have a so-called 1,000-fold

25   advantage as a consequence of this monovalent over here,

1    bivalent binding.  And that's the avidity effect.

10:13A 2    Q    Thank you, Doctor.

3          And do you have an analogy that kind of brings it down

4    to laymen's terms?

5    A    Now, in my understanding, this is a natural driving force

6    for molecules.  So there are certain driving forces in nature,

7    yeah, which we cannot change as humans.  And it's very similar

8    like -- like a human person that also has some natural ways how

9    to act.

10          So, for example, if I have seen now over the course,

11    many of these paper boxes, big boxes with many paper in it and

12    they have two handles on both sides.  And if I as a person

13    wanted to move such a box from one place to another, of course

14    I would first use my first binding side one arm to grab one

15    handle, and then I would feel the box is actually too heavy and

16    I need my second arm, and I would take it to lift it up because

17    this is a much stronger interaction, a much stronger binding,

18    it gives me more grip on the box.  And this is at least in my

19    understanding a very similar way as molecules try to interact

20    with their partners in the most intimate way.

10:14A 21    Q    Okay.  Now, let's turn to Dr. Naismith's testimony on

22    direct.

23          MR. RURKA:  Mr. Haw, can we go to page 111, lines 14

24    through 25.  And let's take this two at a time.

25    Q    So, did you read this portion of Dr. Naismith's testimony,

1      Doctor?

2      A    Yes, I did.

3      Q    Okay.  And he was asked on direct:

4           "As a matter of first principles, at the time of the

5      patent, was there a particular mode that was thought to be more

6      likely than the other?"

7           His answer was:  "The first principles would indicate

8      Mode 1 is much preferred because it has the least

9      stereochemical restraint or conditions."

10          Doctor, do you agree with that testimony?

11     A    I do not agree with the it, because I feel and it is my

12     honest opinion that Mode Number 2 is the preferred mode.

13     Q    Okay.  Let's take a look at the next question:

14          "Would you mind telling me as if I were a sixth grader

15     what that meant"?

16          And his answer was:  "Just that this idea that three

17     dimensional space in Mode 2 is really only one arrangement.  So

18     you have the molecule is prefigured in that arrangement, or is

19     able to adopt it without paying too much of an energy penalty."

10:16A 20          And what is your opinion about the energy penalty that

21     Dr. Naismith is discussing?

22     A    Now, first my opinion is that his answer is, let's say, a

23     one-sided view.  He only looks at the structure.  But as a

24     scientist one also has to keep in mind another general

25     phenomenon that is entropy.  And only if you consider both you

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1   will come up with a meaningful interpretation.  So I do not

2   think that this energy penalty plays a major role here, and I

3   can illustrate this in the next slide.

4   Q   Let's go to DDX- 3016.

5         And can you explain what you're showing here?

6   A     Yeah.  Because when I saw Dr. Naismith's illustrations of

7   Mode 2, illustration of Mode 2, I had the feeling that this

8   kind of binding of the bivalent protein to this TNF trimer is

9   overly complicated because it looks like arms are being

10   crossed, and this is actually, for a molecule, this is indeed

11   unnatural.

10:17A 12         But the point is, what is neglected in this way of

13   presentation is that the two arms of a molecule actually can

14   much more rotate than the human arm, so they can actually

15   rotate by 360 degrees, which I cannot do with my arms, but the

16   molecule can do.  And just by rotating and then turning,

17   turning the bottom, this would be like half of a movement of a

18   dancer.  The whole situation relaxes, and we come up with

19   something which I would call Mode 2B, and this looks now much

20   more relaxed.  And this kind of energy penalty which may

21   certainly happen in Mode 2A is no longer present.

22   Q   Can we turn to DDX-3017.

23         So can you summarize your opinion about the

24   expectation of a person of skill in the art in 1990, about the

25   favorite binding mode between a bivalent binding protein and

Sierra - Cross - Kurka

1     trimeric TNF?

10:18A  2     A    Yes.  So in the end you have to distinguish now between

3     Mode 1 and Mode 2.  And as I explained, Mode 2 is strongly

4     favored by this well-known avidity effect at the time.  And

5     that explains my preference, my strong preference or

6     expectation of Mode Number 2.

7     Q    Okay.  And let's go then to etanercept, go to DDX-3018.

8          What would the expected binding mode be for a molecule

9     like etanercept then?

10    A    So far the pictures are kind of a generic nature for a kind

11    of bivalent binding protein.  Now we go back to the molecular

12    structure of etanercept.

13         And here we have exactly the situation that allows

14    this kind of bivalent binding because each arm of this

15    extracellular receptor portion as part of etanercept can bind

16    to a different subunit but on the same -- and that's the

17    important thing -- on the same TNF trimer.

18    Q    Okay.  Let's go to DDX-3019.

10:19A 19         And this is clipped from Dr. Naismith's direct

20    presentation, his demonstratives.  And Dr. Naismith opined that

21    etanercept exhibits unexpected binding properties because it

22    binds TNF 50 times tighter than the soluble receptor.

23         Which, Doctor, you understand that's just the p75

24    receptor by itself.  Right?

25    A    That's the p75 receptor just cleaved off its transmembrane

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    part, yes, that's what I understand, and it would be a

2    monovalent binding protein.

3    Q    And then he also opines that it neutralizes TNF.  It's

4    unexpected that TNF -- that etanercept neutralizes TNF 1,000

5    times better than the soluble receptor.

6           Do you agree with those opinions?

7    A    No, I do not agree, and essentially for the same reasons

8    which I explained before.

9    Q    Okay.  Let's go to DDX-3020.

10   A    Because this avidity effect strongly indicates, or predicts

11   actually, that it is not only the mode of binding which is

12   preferred, that means this bivalent mode of binding, but also

13   that we have this advantage of multivalence, as Dr. Roitt

14   called it.  And this is a 1,000-fold advantage as a general

15   number, as a, let's say, average number I would say.

16          So it is easy.  If a molecule is a bivalent binding

17   protein can participate in this -- in this bivalent interaction

18   with its antigen, with its trimeric TNF, then it's easy that

19   this strengths of binding is 1,000-fold stronger compared with

20   the soluble receptor.

21          And the soluble receptors is actually a situation that

22   is already foreseen in Dr. Roitt's table.  Because here we have

23   just this monovalent portion of the TNF receptor, and this

24   looks very much like just the binding arm of an antibody.  So

25   that would be this FAB fragment.  And the FAB fragment can also

Skerra - Cross - Rurka

1    only interact with one antigen at the time.  And clearly the

2    FAB situation like the soluble receptor situation is only

3    characterized by ordinary affinity which cannot take advantage

4    of this beneficial effect.

10:21A  5    Q    Thank you, Doctor.

6         Let's move to your second opinion and let's go to

7    DDX-3021.

8         And your second opinion is:  Etanercept's lack of

9    aggregation is not unexpected.

10        And let's go to DDX-3022 then.

11        You explained that the expected binding mode for

12   etanercept would be Mode 2.  And is there a relationship

13   between that binding and aggregate formation, Doctor?

14   A    Yes.  And that's a simple matter of logic.  Because when I

15   formed the complex between etanercept and the TNF trimer, then

16   both arms of etanercept are saturated, as we would say as

17   scientists.  That means they already are fully occupied with

18   one and the same TNF trimer, and so there would be no tendency

19   for additional interactions of etanercept.

20   Q    Let's go to DDX-3023.

21        And can you explain more generally how that would

22   preclude aggregation then?

23   A    Yes.  Now, if we have a solution where there are many

24   copies of etanercept and the similar -- or also many copies of

25   TNF, then all the etanercept molecules would tend, or strongly

Sferra - Cross - Rurka

1    tend to interact with one trimer each.  And as there are no

2    additional binding sites awakened on the etanercept molecule,

3    no further cross-linking can take place.  And without

4    cross-links there is no aggregate formation.

10:22A  5    Q    Let's go to DDX-3024.

6         What does the prior art teach about Binding Mode 2

7    versus aggregation for a bivalent binding protein, with the

8    trimer target?

9    A    Yes.  There's another famous publication which was

10   well-known at the time, already before Roitt published his

11   textbook, and this publication provided the rationale for

12   finding, which was very known in the area of immunology, and as

13   a, let's say, summary of both the experimental situation and

14   the theory which was provided here by Drs. Crothers and

15   Metzger.  They made the following statement, they said:

16        "In situations where multisite adherence to a single

17   particle and cross-linking of discrete particles are both

18   possible, the former is predicted to predominate strongly.

10:23A  19        Now, this is slightly complicated statement.  What

20   does it mean?

21        Multisite adherence to a single particle, that's

22   exactly this Mode Number 2.  That means bivalent interaction as

23   shown here between the two arms of all binding protein with the

24   three subunits of TNF.  So that's the multisite adherence.

25        And opposed to that we have higher order aggregate

1    formation, or simple aggregate formation, that would be the

2    cross-linking of these three particles.  So particles would be

3    TNF particles here.  When they get cross-linked we form this

4    higher order mass.  And there is clear prediction or clear

5    expectation, that the first mechanism.  That means this Mode 2,

6    this one-to-one, this complex formation, that is strongly

7    preferred or predominates.

8    Q    Okay.  And, Doctor, would you call Mode 2 the default mode?

9    A    Yes, that would be the default expectation for the informed

10   scientist at the time.

10:24A 11   Q    So, Dr. Naismith presented some post-priority date results

12   for anti-TNF antibodies like infliximab and adalimumab.  You

13   understand that.  Right?

14   A    Yes.

15   Q    And infliximab, just for the record, is Remicade;

16   adalimumab is Humira.  Do you understand that, Doctor?

17   A    Yes.

18   Q    Were these data available before August 31st, 1990?

19   A    No, they were published much later.

20   Q    Okay.  Let's turn to DDX-3025.

21        How did these -- let's just talk on the general

22   level -- how did these studies of the behavior of adalimumab

23   and infliximab fit in with a person of skill in the art's

24   expectations with respect to binding -- bivalent binding

25   proteins?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1     A    Now, the left side of this slide illustrates a situation I

2     have been talking about in regards to etanercept.  That means

3     etanercept as a bivalent protein would form this one-to-one

4     complex by way of bivalent binding to the same TNF trimer.

5     This is here an illustration of the generic mode, Mode Number 2

6     or generic illustration.

7           Etanercept picks up the bivalent mode of binding which

8     is Mode Number 2 shown here in the generic way, and on the left

9     shown in the representation as the etanercept molecule.

10:26A 10          Now, fundamentally, without looking into the details

11    of the structure, for an antibody one would actually assume the

12    very similar mode of binding.  That means also bivalent mode of

13    binding.  But as I have seen in this later publications,

14    obviously this doesn't happen, so obviously antibodies show a

15    different behavior.  And so obviously they prefer Mode Number

16    1.  And something else happens which I think is illustrated on

17    the next slide.

18    Q    Okay.  Let's go to DDX-3026.

19          What happens if you bind.

20    A    Yes, now --

21    Q    I'm sorry, Doctor, let me finish the question.

22          What happens if they bind in Mode Number 1?

23    A    Yes.  This is actually the expectation that they bind in

24    Mode Number 1.  And this is a situation which was already

25    foreseen, for example, in the Crothers and Metzger publication

1    as an exceptional case.

2              Now, what happens here is that, first of all, once

3    again we go through Mode Number 3, so the FAB arm of the

4    antibody would bind the TNF trimer, and here we arrive at Mode

5    Number 3.

10:27A  6              And now, fundamentally, the other arm of the antibody

7    should have some molecular driving force, as we would call it,

8    to another subunit on the TNF trimer.  But now we come up with

9    a problem which is specific for antibodies.  Because the arms

10   of the antibody are rather stiff and bulky.  And the reason for

11   that is, that each arm of an antibody is made of not only of

12   one chain of amino acids, but two chains of amino acids.  So we

13   have the upper part of the heavy chain and the upper part of

14   The light chain.  The are associated.  They come into in a very

15   intimate way, and they make this FAB arm very bulky and stiff.

16             And now the antibody faces the problem that its second

17   arm can actually not reach around in order to bind to another

18   subunit the same trimer.  So that's something which I would

19   call, or which is known as steric hindrance, and this is

20   actually something which would lead to a energetic penalty.

10:28A 21             Now what's the solution?

22             The antibody watches out for another TNF trimer and

23   gets its second binding site saturated with a different TNF

24   molecule, and that would be Mode Number 1.

25   Q    Doctor, how does that make these particular antibodies

1    different than etanercept?

2    A    Now, the difference here is that in etanercept we have this

3    extracellular region of the TNF receptor which is made only of

4    one chain of amino acids with their domains and with their

5    flexibility, but here we have each arm composed of this double

6    chain of amino acids which makes it much more bulky and stiff.

7    Q    Let's turn to DDX-3027.

8         So what would the consequence of the monovalent

9    binding of the anti-TNF antibodies be?

10   A    Now, looking at the TNF trimer, from their perspective it

11   means that only one subunit is bound to the antibody.  So two

12   subunits are awakened for additional interactions.  That means

13   binding to other antibodies.

14        And this is what can happen, and this is also a

15   well-known phenomenon in immunology, that under some

16   circumstances additional antibodies get bound with one arm and

17   the other arm of the second antibody would bind to another TNF

18   trimer.

19        So, in the end we come up with a situation where all

20   these molecules get cross-linked, and this is now what we call

21   a higher order aggregate or just simply an aggregate, and this

22   can easily consist of several thousand or even more molecules.

10:30A 23   Q    Would that sort of aggregation be expected from etanercept

24   then, or --

25   A    Under these circumstances that's actually -- that's

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    absolutely my expectation.

2    Q    I'm sorry.

3    A    That's my expectation.

4    Q    Would these sort of aggregates form -- would you expect

5    these aggregates to form with etanercept?

6    A    Yes, I would -- sorry, not with etanercept.  Sorry.

7    Q    Okay.

8    A    So far I was talking about the antibodies.  Now let's come

9    back to etanercept.

10   Q    Let's talk about etanercept.

11        What sort of --

12   A    Now, we have to be here honest and clear about the

13   situation of TNF.  And in etanercept we also have one but only

14   one subunit that is unoccupied.

15        So, of course, we can imagine a situation where there

16   is excess amount of etanercept present, and then such

17   additional etanercept molecules can bind to the third binding

18   site.  But this -- by logic this can only lead to two kinds of

19   complexes, the one-to-one complex that would be the

20   three-to-two complex shown here in the middle or the two-to-one

21   complex shown to the right.  But these are the highest

22   complexes we can ever expect from etanercept based on this Mode

23   1 binding -- Mode 2 binding.

10:31A 24  Q    So let's go to DDX-3029.

25        And again, we have Dr. Naismith's slide up here or a

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skerra - Cross - Rurka

1    variation of his slide where he says:  "Etanercept exhibits

2    unexpected binding properties because it tends not to cause

3    aggregations like antibodies."

4              Do you agree with that opinion?

5    A    No, I do not agree with that.  Because as part of my -- of

6    this default mode of binding between etanercept and TNF it

7    should not cause aggregation.

8    Q    Actually, could we go back to DDX-3028.

9              Do you know whether or not this three-to-two or

10   two-to-one binding would be enough to cause effector functions,

11   Doctor?

12   A    Not in my understanding, because it was -- it is known it

13   was generally known in the field that in order to elicit

14   effector functions like CDC or ADCC, we need much larger

15   complexes with thousands of molecules in it.  But here this is

16   at most three molecules.

10:32A 17   Q    And is that understanding based on Dr. Greene's testimony?

18   A    Yes, and also on my general knowledge.  But I fully agree

19   with expert Dr. Greene.

20             MS. RURKA:  Okay.  So, let's turn to DDX-3030.

21   Q    And I'm sorry for that aside.

22             Dr. Naismith also testified that the Capon 1989 paper

23   that's JTX-58 at page 2 demonstrates that a bivalent molecule

24   like Dr. Capon's CD4 molecules, you would expect some

25   agglutination with these types of bivalent fusion proteins.  Do

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skerra - Cross - Rurka

1    you agree with that?

2    A    No, I do not agree with that.  And in order to understand

3    that, we have to keep in mind it's not only the properties of

4    the bivalent binding protein, it's also the properties of this

5    antigen, the green blobs which are here.  And it was well-known

6    that in the way how gp120, the antigen used in this study, how

7    it was applied, the gp120 was just in a monomeric state, not

8    like a trimer like TNF.  So it was only monomeric gp120.

9        And here it was absorbed through on red blood cells.

10   And under such circumstances the bivalent binding protein has

11   no other choice than binding according to Mode Number 1, that

12   means with each arm grabbing a different gp120 molecule on a

13   different red blood cell.

10:34A 14   Q    And can we go to DDX-3033, and let's talk about Dr. Kohno.

15       You understand Dr. Naismith cited Dr. Kohno's work

16   from 2007, again postdating the priority date?

17   A    Yes.  This was a very interesting study on the biophysical

18   characterization of the way how antibodies on the one hand or

19   etanercept on the other would interact or do interact with the

20   TNF trimer.

21   Q.   So, Doctor, before we get into that, you understand Dr.

22   Kohno -- this is PTX-140 at pages 2 and 3 -- and do you

23   understand Dr. Kohno was testing, again, adalimumab and

24   infliximab against etanercept?  Right?

25   A    Yes, that's what I understand.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skeria - Cross - Kurka

60

1    Q    Okay.  So what sort of results did Dr. Kohno find?

2    A    Yes.  Now, Kohno and colleagues, they used a method which

3    is well-known, it's the size exclusion chromatography, and this

4    is a way that allows us to study the size of particles that

5    form in solution.

6         And let me start with the simpler result here which is

7    actually shown for etanercept on the right.  Let's first have a

8    look at this red curve.  And here we see something which we

9    call a peak.  And this peaks -- this peak corresponds to

10   etanercept itself.  So this is the position where this peak is

11   on the X axis is an indicator of the size of etanercept.

10:36A 12      And the blue curve, that's the result of a mixture of

13   etanercept with the TNF trimer.  And here we see that the peaks

14   shift to the left.  And the more to the left they shift, the

15   larger is the molecular size.  And this can actually be

16   quantitated using some molecular size standards, this is what

17   the colleagues did here, and then from the size it can be

18   judged, what is the composition of this molecular species.

19        And here they conclude, we have actually two species,

20   one is the two-to-one complex between etanercept and the TNF

21   trimer, and the other one is the one-to-one complex, even

22   though, not annotated here.

23        Okay.  Now we go to the experiments with the two

24   antibodies.  Adalimumab is shown on the left and infliximab on

25   the lower right of the left side of this slide.  Again, we see

1    in the -- in some curves we see the individual components.

2    That means before they are getting mixed.  And again this gives

3    peaks on the right side of these chromatograms which nicely

4    correspond to the isolated antibodies.  But the mixture shows a

5    totally different appearance, so there are no peaks in the

6    middle, we only see peaks to the left, and peaks to the very

7    left means they must be very large.

8         So obviously there are several species.  But the

9    highest peak we see here for the aggregate, and this is

10   indicated by the labels used by the colleagues of Kohno and

11   co-workers.  They say on the left side are the adalimumab TNF

12   and infliximab in brackets "n times."  And "n times" means

13   there are uncounted numbers of both molecules present in this

14   kind of particle.

15        So these are these typically -- these typical high

16   order complexes with thousands of molecules in it, and very

17   similarly for infliximab in the middle graph.

10:38A 18   Q    Thank you Doctor.

19        MR. RURKA:  So let's go to DDX-3034.

20   Q    And you understand that Dr. Kohno also tested, according to

21   Dr. Greene, Dr. Kohno also tested these three molecules in

22   Ouchterlony assay.  Correct?

23   A    Yes.  The Ouchterlony assay, that's a classic biological

24   assay.  And here we can also, if present, we can detect

25   aggregates when two molecular species encounter each other; so

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    TNF and then either one of the antibodies or etanercept.

2           And surprisingly, they found that such aggregates

3    which are seen here so-called precipitation lines form between

4    TNF and the antibodies.  And this is actually what they state

5    in their discussion:  "The mAbs typically do not form

6    precipitable complexes in these types of assays."

7           So that is the formation of aggregates between

8    adalimumab an dTNF or infliximab and TNF was not expected from

9    this site.  They showed these antibodies showed the unexpected

10   properties.

10:39A 11   Q    Okay.  So when it says, "the mAbs"; mAbs, that's the

12   antibodies?

13   A    Monoclonal antibodies like adalimumab or infliximab.

14   Q    Thank you, Doctor.

15          Let's go to slide DDX-3035, and we'll talk about your

16   final opinion:  Etanercept's role in CDC and ADCC is not

17   unexpected.

18          And you understand that Dr. Greene -- I think earlier

19   we talked about this -- that Dr. Greene testified that

20   aggregation is required in order to elicit CDC and ADCC?

21   A    Yes, I'm absolutely on the same page with him.

22          MS. RURKA:  Let's go to DDX-3036.

23   Q    What would be a person of skill in the art's expectations

24   in 1990, with respect to ADCC or CDC activity of a bivalent

25   molecule like etanercept in the presence of trimeric TNF?

1    A    To my understanding the primary target of etanercept is the

2    soluble trimeric TNF.  And as I explained before, there I

3    expect this one-to-one complex formation according to Mode

4    Number 2.  That means there would be no aggregate.  And if

5    there's an aggregate, there would be no CDC and no ADCC, and

6    that's my expectation.

10:40A  7    Q    And on the left side of your slide you ever transitory

8    membrane-bound TNF.  Could you just explain what you mean by

9    that?

10   A    Yes.  This shows essentially the way, how the TNF is

11   produced in the body, and there's a so-called precursor, that

12   means an initial stage of this protein, which is first made as

13   a membrane-bound version, and only after cleavage of the part

14   which I would call membrane anchor, only then the TNF, the

15   soluble TNF is released into a solution, that means into the

16   body fluids.  And this release is mediated by enzymes, by

17   so-called proteinases, which are very efficient in cleaving

18   this TNF from the membrane anchor.

19   Q    Let's go to PTX-30 in your book.  This is a 2009

20   publication by Dr. Arora.

21        Have you reviewed this?

22   A    Yes.

23   Q    And do you understand that Dr. Greene relied on this and

24   that the applicants relied on this in the Patent Office, or

25   these kinds of studies in the Patent Office.  Is that right?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

10:41A  1    A    That's what I have seen, yes.

2    Q    Okay.  And again, this post-dates the priority date.  Is

3    that right, Doctor?

4    A    This is from the year 2009.

5    Q    Are you aware of any prior art testing regarding the CDC

6    and ADCC activity of any anti-TNF antibody before August of

7    1990?

8    A    No, I haven't seen such a study.

9         MS. RURKA:    Okay.  Let's go to DDX-3037.

10   Q    And this is a call-out of part of Dr. Arora's paper.  Can

11   you explain for the Court what the experimental setting was

12   used in Dr. Arora's studies?

13   A    Yes.  Arora and colleagues, they were interested in CDC and

14   ADCC functions of TNF-binding proteins of antibodies in

15   etanercept.  And of course, in order to investigate CDC and

16   ADCC, we need to have a cell-based assay.  Because the

17   phenomenon in the end is cytotoxicity, that means cell

18   toxicity.  We can only observe this if we work with cells.

10:43A  19        And in order to study this, they created a so-called

20   experimental system.  And here they engineered cells to express

21   a stable form of TNF in its membrane-bound state.  That means

22   the protein in the TNF trimer stays bound to the cell surface

23   of these cells.  And in order to achieve this, they produced a

24   mutant protein.  And in this study I believe they deleted 12

25   amino acids from the linker between the transmembrane region or

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1   this membrane anchor and the actual TNF trimer.  And in this

2   way there's no cleavage site for the proteinase accessible, and

3   apparently this leads to stably membrane-fixed TNF.

4   Q    Did the results here say anything about how etanercept

5   would work on soluble TNF or non membrane-bound TNF?

10:44A  6   A    I mean, there are some studies, but those studies performed

7   with the mutated cell line only relate to the membrane-bound

8   form of TNF.

9   Q    Let's go to DDX-3038.

10       And because of the way this study was conducted, did

11   the authors note any limitation of their results?

12   A    Yes, of course, because these are artificially engineered

13   cells with a foreign gene.  That means the mutated gene

14   inserted into the cells.  This often leads to a phenomenon we

15   call "over-expression," and this was actually noted by the

16   authors in the discussion of their study when they say:  "It

17   should be noted, however, that the level of mTNF..." -- which

18   would be the membrane-bound form -- "...expression on those

19   MT-3 cells may reach supraphysiologic levels, representing a

20   potential limitation of the functional studies."

21       That means it is not clear whether -- it's actually

22   doubtful whether the number of membrane-bound TNF on those

23   engineered cells reflects the physiological situation in the

24   patient.

10:45A  25       MR. RURKA:  Okay.  And this for the record is PTX-130

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

```
 1    at page 6.
 2              Let's go to DDX-3039.
 3    Q    I think we just mentioned earlier that Dr. Arora submitted
 4    a Declaration to the Patent Office in support of patentability
 5    of the patents-in-suit.
 6              Do you understand that.  Right, Doctor?
 7    A    Yes.
 8              MR. RURKA:  Okay.  And I believe that's PTX-6.459.
 9    Q    We have up here on the screen page 2.  And what
10    experimental study did Dr. Arora use for the results she
11    submitted to the Patent Office?
12    A    Now, I have seen this report, and to the extent that I
13    understand it or I see the experimental data, these are
14    identical with the scientific publication I was just talking
15    about.
16    Q    Okay.  Dr. Greene on his direct also mentioned another
17    article by Dr. Mitoma.  Do you recall that?
18    A    Yes.
19    Q    That was published in 2008.  Correct?
20    A    Yes, and the year before it was actually quoted in Arora's
21    publication.
22    Q    Okay.  That's DTX-213.
23              Can you take a look at that in your binder and
24    identify it.
10:46A 25  A    Please give me a moment.
```

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1          Yes, it's in my binder.

2     Q    And what is this --

3     A    This publication is again about a comparison among

4     infliximab, etanercept, and adalimumab with regard to ADCC and

5     CDC.

6     Q    Did you rely on this in forming your opinions in the case,

7     Doctor?

8     A    Yes.

9     Q    Let's turn to DDX- 3040.  First we'll take a look at the

10    "Materials and Methods" section of the Mitoma paper.  And this

11    at page 2 of DTX-213.

12          And what sort of study conditions did Dr. Mitoma use?

10:47A  13  A    These also used a very similar approach but with

14    differences in the detail.  Again, they tried to prevent this

15    TNF cleavage from the cell membrane by using or by engineering

16    a mutated cell line.  But in this case they didn't delete a

17    stretch of amino acids but they replaced two amino acids in

18    this linker region between the membrane anchor and the TNF

19    trimer part.

20          But this had the same effect.  That means the

21    proteinase could no longer cleave off the soluble TNF from the

22    cell membrane.

23    Q    And if we go to DDX-3041, this is a call-out of DTX-213 at

24    page 8.

25          Did Dr. Mitoma note any limitation of his results?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

```
           1    A    Yes.  Again, he's also was aware of the limitations of
           2    their experimental system, and they again -- or similarly they
           3    stated that in their discussion when saying, considering that
           4    our assay system utilizes a human T cell line with accumulated
           5    transmembrane TNF-alpha expression, our study is not without
           6    its limitations.
10:48A     7          So again, the question is:  How well does this
           8    translate to the physiologic situation in the patient.
           9    Q    And let's turn to DDX-3042 finally.
          10          What results did Arora, Dr. Arora and Dr. Mitoma each
          11    present with respect to ADCC?
          12    A    Now, their findings are actually mixed because Mitoma and
          13    colleagues on the one hand, they saw that had ADCC activities
          14    were almost equal among those three agents, which means
          15    infliximab, adalimumab and etanercept; but, on the other hand,
          16    Arora and colleagues, they conclude that infliximab and
          17    adalimumab induced ADCC much more strongly than etanercept.
          18    Q    So those results conflict, Doctor?
          19    A    Yeah.  So, it means for me that almost 20 years after the
          20    relevant date on which I was asked to provide my opinion, it
          21    was still not clear which role ADCC plays.
          22    Q    Thank you.
10:49A    23          MR. RURKA:  No further questions.
          24          THE COURT:  Thank you.  Do you want to take a few
          25    minutes?
```

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

```
 1                    MR. WINTERS:  Just a brief break.
 2                    THE COURT:  Let's take ten minutes.  You may step
 3        down.  Thank you.
 4                    (Witness temporarily excused.)
11:03A 5              (Proceedings resume.)
 6
 7        A R N E    S K E R R A, resumes, testifies further as follows:
 8
 9                    THE DEPUTY CLERK:  All rise.
10                    THE COURT:  Please be seated.  Thank you.
11:07A 11            Any new demonstratives, or just the binders?
12                    MR. WINTERS:  Just the binder, your Honor.
13                    THE COURT:  Thank you.  We're ready.
14                    Go right ahead.
15                    MR. WINTERS:  Thank you,
16                            DIRECT EXAMINATION
17        BY MR. WINTERS:
18        Q   Good morning, Dr. Skerra.
19                    MR. WINTERS:  Could we have PDX-9.46 up, please.
20        Q   Before we do that, would you agree, Dr. Skerra, that
21        bivalent proteins are not, in fact, mirror images of each
22        other?  Is that correct?
11:09A 23      A   Yes.
24        Q   And that was known at the time.  Correct?
25        A   Yes.
```

Skerra – cross – Winters

1  Q   And, in fact, proteins have a directionality to them.

2  Correct?

3  A   Yes.

4  Q   And that was known at the time?

5  A   Yes.

6  Q   And, in fact, scientists refer to proteins as having a

7  handedness.  Yes?

8  A   Yes.

9  Q   And they refer to proteins as having a left-handedness.

10  Correct?

11  A   Actually the handedness happens on the level of amino

12  acids.  And if we talk about L amino acids, "L" stands for

13  left, yes.

14  Q   And so the depiction we have up here of the bivalent

15  protein with a left-hand -- this is PDX-9.46 -- dealing with

16  the left-hand with the palm out and then a left-hand with the

17  palm in, although it's a cartoon, as you scientists would say,

18  that's technically accurate in terms of the way the molecule is

19  constructed.  Right?  It spins about on an axis rather than

20  being a mirror image of each other?

11:10A 21  A   Yeah.  We call it a two-fold rotation axis, that's true.

22  The two parts of any bivalent protein are related by 100

23  degrees rotation.

24  Q   Okay.  And so the hands Dr. Naismith has put up there,

25  although it's simplified, that's technically accurate with

Skerra - Cross - Winters

1    respect to a bivalent protein.  Yes?

2    A    I imagine.

3    Q    Okay.  Why don't we take a look, please, if we could at the

4    37slides you just presented to the Court.

5         MR. WINTERS:  And if we could put up, Bill, slide DDX-

6    3028.

7    Q    I believe, Doctor, when you were testifying about slide

8    DDX-3028, you said you needed an honest and -- I'm sorry -- you

9    needed to be, quote, honest and clear about the nature of

10   etanercept, closed quote.

11        Do you recall that testimony generally?

11:11A 12  A    Honest and clear?

13   Q    Yes.  I wrote down that you said that:  We need to be

14   honest and clear about the nature of etanercept.

15        First of all, would you agree that we need to be

16   honest and clear about the nature of etanercept?

17   A    Yes.

18   Q    The picture on the left, that shows a left-hand and a

19   right-hand.  Correct?

20   A    I don't think so, it shows etanercept.

21   Q    Right.  Etanercept doesn't actually look like the picture

22   on the right, even as simplified.  Isn't that right?

23   Etanercept has, as a bivalent protein, two left hands.  Right?

24   A    I mean, it's a molecule.  The hand is a very abstract

25   depiction anyway.  To me it's a molecule.  I see it as

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

          1    molecule, not as a hand.

          2    Q   Right.  And in etanercept the molecule, the right and left

          3    arms are not mirror images of each other.  Correct?

          4    A   No.  As I just said, they are related by a rotation.

11:12A    5    Q   Right.  So they have as we showed in the simplified

          6    cartoon, two left hands.  Correct?

          7    A   If you say so, this may be a way of depicting it.

          8    Q   Okay.  So if we wanted to make even at the cartoon level

          9    that more accurate, what we'd do is we'd rotate the right green

         10    portion in the right-hand part of that slide 180 degrees.

         11    Right?  So you would have two left hands rather than a right

         12    and a left?

         13         Even at the cartoon level, if we were trying to be

         14    more accurate, that's what we would do.  Right?

         15    A   Sorry, I do not understand the question.

         16    Q   I'll try again with a pointer although my track record with

         17    these is not triumphant.

         18         You depicted here the left-hand, as it were, of the

         19    etanercept arm.  Correct?

11:13A   20    A   I think actually this was done by a graphics expert, but to

         21    me this is just one extracellular region of a receptor.  I

         22    wouldn't see it as hands.  I mean, of course I used the

         23    analogy, I was talking about arms.  But for me, this is a

         24    depiction of a molecule, of a protein.

         25    Q   Well, it's not just a protein, Doctor.  Right?

1             I'm sorry, do you prefer "Doctor" or "Professor"?

2      A    As you like.

3      Q    Which do you prefer?

4      A    "Doctor."

5      Q    Okay.  Doctor, you -- this is not just a protein, this is

6      etanercept.  Correct?

7      A    Etanercept in my understanding is a protein.

8      Q    Okay.  And you depicted it, sir, as being -- you depicted

9      the two arms as being mirror images of each other.  Correct?

10     A    I mean, this is a two-dimension image to me.  So if you

11     took the left part and rotate it by 180 degrees on a vertical

12     axis you come exactly up with the picture for the right part.

11:14A 13     Q    Exactly.  So if you took one of these halves and rotated it

14     180 degrees, that would be a more accurate depiction of

15     etanercept.  Would you agree with that?

16     A    Yes, but I would expect that it looks exactly like it is

17     depicted here.

18     Q    Okay.  I didn't quite hear the first part of that your

19     answer.

20     A    If I would, I would say as a scientist, if I performed this

21     operation, that means the 180 degrees rotation, I would exactly

22     come up with the picture as it is drawn here on the left.

23     Q    We may be missing each other.

24             Let me start again.  I take it from the title of this

25     slide, you meant this to be an accurate representation of

1    etanercept.  Correct?

2    A    It's an abstract representation of course.  This is not

3    molecular detail.

4    Q    Right.

5    A    But so far on this level of abstraction, I think in my --

6    as far as I am familiar, this is an accurate representation.

7    Q    Okay.  And etanercept is not actually with respect to the

8    two arms a mirror image of each other.  Correct?

9    A    The left is not a mirror image of the right, absolutely.

11:15A 10    Q    But in this depiction you've depicted it as mirror image.

11    Correct?

12    A    I do not agree.  Because mathematically on this

13    two-dimensional plane as we see here there's no distinction

14    between the rotation across the vertical axis or a mirror

15    representation.  There's no distinction here, mathematically

16    speaking.  I'm sorry.

17    Q    With the two left hands that we looked at a moment ago in

18    mind, would you agree that a more accurate depiction, even at

19    this abstract level, of etanercept would have been to have

20    shown one of these arms rotated 180 degrees so that they're not

21    cupped like that?  Right?

22    A    No.  I get an idea what you talk about.  You may talk about

23    translation.  So if I just shift the left arm to the right,

24    then it would look different of course, but this is what my

25    purpose I'm trying to avoid.  I tried to give a more realistic

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

 1    representation.

 2              So in my understanding -- and I think every other

 3    scientist would agree -- the left part and the right part are

 4    here connected by a kind of virtual axis.  Virtual because this

 5    is not in space, this is just a projection, this is only on the

 6    two-dimensional projection plane.  We would have to look at the

 7    three-dimensional structures.  So we need to insert a dimension

 8    then in order to then talk about what you're up to.  But this

 9    is not shown here on this slide.

11:17A 10              MR. WINTERS:  Okay.  Why don't we look, if we can, at

 11   DDX-3010.

 12   Q   This is your depiction of the expected binding of

 13   etanercept to soluble TNF.  Correct?

 14   A   Yes.

 15   Q   And the way you've depicted this, the molecule -- it would

 16   be impossible for the molecule you've depicted here to bind a

 17   second trimer, wouldn't it?  This is just going to always bind

 18   that one trimer as you've depicted it.  Fair?

 19   A   No, we were just talking about rotation.  And just to

 20   explain it now, I have rotated the left image by almost 90

 21   degrees, not quite, almost 90 degrees.  Okay?  And now because

 22   the TNF is a trimer, you can see the difference.  So I think

 23   this is quite accurate on the scientific level.

11:18A 24   Q   It's fair to say you don't have personal experience,

 25   personal experience with the TNF receptor.  Correct?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skerra - Cross - Winters

```
     1    A    That's right, yes.
     2    Q    Have you ever done studies to investigate the signaling
     3    associated with TNF and TNF receptors in the course of your
     4    research?
     5    A    No.
     6    Q    Have you ever done studies on the structure of TNF-alpha?
     7    A    No.
     8    Q    Have you have ever done studies on the structure of TNF
     9    receptors?
    10    A    No.
    11    Q    I take it then you have no papers published on the structur
    12    of TNF-alpha.  Is that correct?
    13    A    Yes.
    14    Q    And you have no papers published on the structure of TNF
    15    receptors.  Correct?
    16    A    Yes.
    17    Q    Is it fair to say that your knowledge of the interactions
    18    of TNF proteins with TNF receptor proteins that you express in
    19    this case were formed by your review of information for
    20    purposes of this case only?
    21    A    Yes.
    22    Q    You talked earlier about whether or not etanercept has
    23    displayed unexpected properties and, in particular, CDC and
    24    ADCC.  You've offered those opinions here.  Correct?
11:19A   25    A    Yes
```

1    Q    Have you ever personally conducted experiments like
2    experimental assays which investigate CDC?
3    A    No, I have never done such experiments.
4    Q    Have you personally conducted experiments like experimental
5    assays which investigate ADCC?
6    A    No.
7    Q    Have you done experiments where you're comparing the
8    effects of CDC activity that are linked to differences in
9    protein structure?
10   A    No.
11   Q    Have you done experiments where you're comparing the
12   effects of ADCC activity that are linked to differences in
13   protein structure?
14   A    No.
15   Q    Have you ever published any original scientific research
16   that is looking into the effect of antibody structure and
17   effector functions of antibodies?
18   A    I have written a couple of publications about antibody
19   structure and function.  I do not think that -- but I'm not
20   quite sure that this point was touched.
11:20A 21            MR. WINTERS:  Could we have Dr. Skerra's deposition at
22   35, lines 22 through 37?
23            This can't be right.  Sorry,
24            May I just have a moment, your Honor?
25            THE COURT:  Yes.

```
              1                   (There is a pause for Mr. Winters.)

              2                   MR. WINTERS:  We have Dr. Skerra's deposition at page

              3         35, line 23 through page 36, line -- what's it, Jeff?  Through

              4         line 6.

11:21A        5                   MR. RURKA:  Oh, this is improper impeachment.

              6                   MR. WINTERS:  He says at the bottom he didn't do

              7         specific research on effector functions.

              8                   MR. RURKA:  That's not what he testified.  He didn't

              9         testify contrary to that today.

             10                   THE COURT:  Hold on.

             11                   You know what, you can go ahead with it.

             12                   I think the question was:  Have you ever published any

             13         original scientific research that is new looking into the

             14         effect of a structure of effector functions.

             15                   MR. WINTERS:  Why don't we take that down and I'll

             16         just ask the question.

             17                   THE COURT:  Go ahead.

             18         BY MR. WINTERS:

             19         Q   Doctor, do you recall if you published any original

             20         scientific research looking into the effect of antibody

             21         structure and the effector function of antibodies?  Have you

             22         done that?

11:22A       23         A   Looking back 30 years, I don't think so, but I would have

             24         to have a closer look at my publication list.

             25         Q   Okay.
```

1    A    The question in the deposition was related to my Ph.D

2    thesis.

3    Q    I'm sorry?

4    A    The question in the deposition was referring to my Ph.D

5    work.

6    Q    Okay.  With respect to forming your opinions in this case,

7    you did not independently determine the amino acid sequence of

8    etanercept to form your opinions, did you?

9    A    What do you mean by "independently determine"?

10   Q    Did you verify -- did you look to any document -- well, you

11   got -- withdraw that.

12        You got the number of amino acids in the TNF portion

13   of the etanercept molecule from counsel.  Correct?

11:23A 14   A    Yes.

15   Q    And you didn't then independently yourself go out and

16   confirm whether what they told you was correct, did you?

17   A    No, I didn't have access to original documents that would

18   have described the structure of etanercept at this level.

19   Q    And for purposes of your opinions about unexpected results

20   as you expressed them in your report, you understood that the

21   p75 portion of the etanercept molecule had 185 amino acid

22   residues.  Correct?

23   A    185 or 235.

24        MR. WINTERS:  Could we have, please, Dr. Skerra's

25   report at page 26, paragraph 78 up.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1          Bill, could you highlight the last sentence, please.

2     Q    You didn't say in your report, Doctor, "185 or 235," did

3     you?  You said, "I have been informed that the extracellular

4     domain" -- let me stop there.  Extracellular domain -- well,

5     let me start again.

11:24A  6          What you said was:  "Additionally, I've been

7     informed."

8          That's by counsel, correct?  You've been informed?

9     A    That's the information which I received, yes.

10    Q    That the extracellular domain of the TNF receptor used in

11    etanercept has 185 amino acid residues.

12         That's what you told us in your report.  Correct?

13    A    Yes.

14    Q    And --

15         MR. WINTERS:  Bill, could you highlight the sentence

16    just before that, please.

17    Q    And you set forth that understanding on which your opinions

18    were based in specific contrast to the number of amino acid

19    residues in the TNF receptor extracellular region.  Correct?

20    That's what you were communicating in that sentence that we

21    just highlighted?

22    A    Excuse me?

23    Q    In the last sentence you informed us what the molecule that

24    you analyzed looked like in terms of the number of amino

25    acid -- number of amino acids in the TNF portion.  Correct?

Skerra - cross - Winters

11:25A  1    A    Yes.

2    Q    And in the sentence just before, you told us how many amino

3    acids were in the extracellular region of the p75 TNF receptor.

4    Correct?

5    A    About 235 amino acids, yes.

6    Q    Right.  And that fusion protein, an IgG portion and a TNF

7    portion with 185 amino acids residues was the molecule you

8    considered in forming all your opinions that you've expressed

9    here today.  Correct?

10   A    In principle, yes.

11   Q    But, in fact, sir, etanercept does not actually have only

12   185 amino acid residues in the TNF portion, does it?

13   A    No, I learned later that the portion is larger, but this

14   doesn't change my opinion.

15   Q    On that subject, suppose -- you say it doesn't change your

16   opinion.  Let's look at that.  Suppose you took the etanercept

17   molecule that you told us you looked at in your report with 185

18   amino acids rather than the correct number, and up added 50

19   amino acids residues between the TNF receptor and the IgG

20   portion, so now you've got the full 235.

11:27A 21        You agree, don't you, that that fusion protein with

22   the full p75 TNF receptor sequence would be more likely to bind

23   different TNF trimers as opposed to binding one TNF trimer.

24   Isn't that correct?

25   A    No.

             1          MR. WINTERS:  Bill, could we play, please, the clip at

             2     deposition page 275 leading with line 21 running through 276,

             3     line 3.

             4          (An excerpt of a deposition is played in open court;

             5     and stopped.

             6     Q    And the aggregation you're referring to in that clip, sir,

             7     is the physical or biological phenomenon in which the bivalent

             8     protein is binding to separate TNF trimers and not one.

             9     Correct?

11:28A      10     A    But I understood the question in a different way.  I think

            11     the question was talking about adding additional 50 amino

            12     acids, and this is what I understood adding over the natural

            13     biological situation.

            14          So my assumption was, I have this extracellular

            15     portion of the receptor, and this is a biological molecule as

            16     it was made by nature, so it's obvious made to bind TNF-alpha.

            17     So in this picture it's not really necessary to know the

            18     precise number of amino acids.  I mean, I confirmed the

            19     literature and so far as I looked at the Dembic paper and I

            20     have seen that all four domains of the receptor must be

            21     present.  And so I watched at this extracellular region like a

            22     natural biological molecule.  Okay?

            23          But then the question is:  What happens?  And I mean

            24     if the natural molecule is a few amino acids more or less, the

            25     assumption is that this chain of amino acids folds into

            WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skefra - cross - Winters

1    something which we would call an immunoglobular domain, and the

2    immunoglobular domain is like a potato-shaped molecule, that

3    means as we have seen for the TNF-alpha, it's folded and it

4    forms a functional state.

11:29A    5    Now, if I add something artificially, then we come up

6    with a different situation.

7    Q    Right.  And the question you were asked at your deposition,

8    sir, asked you to take the molecule that you've said you

9    actually looked at, which we've displayed in your report, and

10    added 50 amino acids to it between the hinge and the TNF

11    portion, what would you expect that to do?

12    And what you told us at the time -- just at the time,

13    was that that molecule would be likely to cause more

14    aggregation.  Isn't that what you told us?

15    A    Yes.

16    Q    And you did not correct that testimony in your transcript,

17    did you, sir?

18    A    No, but I believe the topic was further discussed in my

19    deposition, and I think I provided additional opinion in this

20    regard.

21    Q    And you did not -- withdraw that.

22    And you did not provide a supplemental report

23    correcting your report, did you, sir?

11:30A    24    A    What do you mean?

25    Q    You gave us a report at one time in the case.  Correct?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    A    Yes.

2    Q    At no point did you provide us another version of that

3    report correcting anything you had said in the initial report.

4    Correct?

5    A    No.

6    Q    That's wrong?

7    A    I did not submit another report or a corrected version

8    except for minor corrections which I produced.

9    Q    Okay.  Would you agree that a fusion protein has to

10   aggregate in order for it to have effector functions?

11   A    It depends on the effector function.  But if you talk about

12   CDC and ADCC, I mean, there are more effector functions out

13   there like plasmid, half-life extension and things like that.

14   With regard to CDC and ADCC it is my understanding that I need

15   multiple, that means many copies of the Fc portion of an

16   antibody or a fusion protein in order to elicit CDC or ADCC.

11:31A 17   Q    Let me just ask perhaps a better question so the record is

18   clear:  Would you agree that a fusion protein has to aggregate

19   in order for it to display CDC and ADCC?

20   A    Yes.

21   Q    Do you agree that Dr. Capon expected in his first CD4

22   fusion constructs discussed in his 1989 article to retain both

23   ADCC and CDC?

24   A    I don't know about his expectations.

25        MR. WINTERS:  Could we have JTX-58 at page 1, the

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skerra - Cross - Winters

1  right column and the second first full paragraph up, Bill.  So

2  the right column, the other right column.

3        Perfect.

4  Q   And do you see, sir, about five lines down it says:

5  (Reading) Second, we wanted to incorporate functions such as Fc

6  receptor binding, protein A binding, complement fixation and

7  placental transfer, all of which reside in the Fc portion of

8  the IgG.

11:33A  9        Do you see that?

10  A   Yes.

11  Q   Would you agree that that would have told the ordinary

12  artisan at the time that Dr. Capon expected to retain CDC and

13  ADCC in his fusion constructs?

14  A   I would rather call it a desire.  I do not know what he

15  honestly expected.  But, I mean, obviously this was one of the

16  questions which was investigated in the study.

17  Q   Okay.  And Fc receptor binding, that functionality is

18  triggered by the hinge between the -- excuse me -- it's

19  triggered by the junction between the hinge and the CH2.

20  Correct?

21  A   I'm not so sure whether this was known at the time at this

22  level of detail.  At least it was clear that the Fc receptor

23  interaction was somewhere in the region of the CH2 domain.

24  Q   And the functionality -- sorry -- the portion of the

25  structure that triggered the functionality that is CDC, that

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

```
         1    resided in the CH2 domain.  Correct?
11:34A   2    A   You're now talking about CDC?
         3    Q   Yes.
         4    A   I rather thought CDC would involve the protein region.  But
         5    anyway, it's the Fc portion, I mean without now discussing
         6    individual amino acids.
         7    Q   And as you sit here today, you don't know where in terms of
         8    the structure the functionality -- withdraw that.
         9          As you sit here today you don't know where in the
        10    structure the domain is that triggers the functionality that is
        11    CDC?  You don't know that?
        12    A   I know that it's in the Fc region.  Where exactly, I mean,
        13    I think there was a publication by Greg Winters' group.  One
        14    could look it up.  That was known at the time.  But I can't
        15    tell you the individual amino acids by heart.
        16    Q   Can you tell me the region, sir, without --
        17    A   It's the CH2 region, which actually translates on its
        18    N-terminal side into the hinge.  Somewhere in this region,
        19    those -- both the binding activity for the Fc receptor and the
        20    binding activity for C1q is located.
        21    Q   So focusing just now on CDC, can you tell me in what domain
        22    in the Fc that functionality -- where that functionality is
        23    triggered?
11:35A  24    A   I think it was CH2 domain and part of the hinge region.
        25    Q   And, in fact, Dr. Capon in his contructs actually found
```

 1   binding to Fc receptors, correct, in that 1989 paper?

 2   A   I think so.

 3   Q   Let's remove the doubt.

 4        MR. WINTERS:  Could you put up JTX-58 page 5, the left

 5   column, and there's a paragraph that begins:  "Thus, our

 6   immunoadhesins bind well to Fc receptors."

 7        There you go.

 8   Q   Okay.  Maybe we can clear up what you said with some

 9   uncertainty on your part, Doctor.

10        Dr. Capon reported here, correct --

11        MR. WINTERS:  Bill, if you can highlight "As far as is

12   known."  No, the sentence that begins "as far as is known."

13        Perfect.

11:36A 14   Q   (Reading) All the critical contact residues for C1q binding

15   reside in the CH2 domain in the heavy chain.

16        Let's stop there.  C1q binding is a step in the

17   process that leads to CDC.  Correct?

18   A   Yes, that's general --

19   Q   What he's -- I'm sorry, I may have talked over you.  What

20   was your answer?

21   A   That's the general understanding, yes.

22   Q   And what he was reporting there is in terms of what was

23   known in the art at the time, and he provides a reference, the

24   critical contact residues, all of them were in the CH2.  Do you

25   see that?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    A    The critical contact residues, yes.

2    Q    You don't have a basis to dispute that that was known in

3    the art at the time, do you, sir?

4    A    No.

5    Q    Okay.

6         MR. WINTERS:  Bill, if you could highlight that first

7    sentence: "Thus, our immunoadhesins..."

8    Q    That Fc receptor binding, that is an early step in the

9    biological process that yields ADCC.  Correct?

11:37A 10    A    Yes.

11    Q    And so what he found there was if his constructs --

12    withdraw that.

13         MR. WINTERS:  Perfect, thank you.

14         Bill, keep that up.

15    Q    Dr. Capon was surprised that his constructs did not bind

16    C1q, wasn't he?  His article reflects that?

17    A    He may have expressed his opinion in the discussion later

18    on.

19    Q    Yeah.  It says right here:  "It's perhaps surprising that

20    they did not bind" --

21    A    It's perhaps surprising, yes.  It says "perhaps."

22    Q    And the reason he was surprised was that, and he explains

23    in it the next says:  "As far as is known, all of the critical

24    contact residues for C1q binding are present in the CH2 domain

25    correct.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

11:38A 1    A    Yes.

2    Q    So what the ordinary artisan would have understood from

3    that was, because Dr. Capon's construct retained the CH2

4    domain, he expected to get C1q binding.   Correct?

5    A    No.

6    Q    Isn't that what he says?   It's perhaps surprising that they

7    don't bind C1q, and then he tells the ordinary artisan why?

8    A    Yes.   He was surprised but I would not have been surprised,

9    and other scientists also would not have been surprised because

10   it was also known at the time that the strengths of binding

11   between the CH2 domain or, let's say, the Fc part of an

12   immunoglobulin and the C1q component of the complement system

13   is very weak, and you need to bind several copies of C1q at

14   once in order to really demonstrate the binding and also in

15   order to elicit the CDC.   This was well-known at the time.   I

16   don't know why he doesn't refer to this knowledge in this

17   publication.

11:39A 18   Q    As far as you're aware, this publication was the very first

19   IgG fusion construct published anywhere.   Right?

20   A    To my knowledge, yes.   And actually I even picked this

21   publication up during my Ph.D thesis and presented it in

22   journal club, so I'm well aware of this publication and its

23   role in science, yes.

24   Q    You're not holding yourself out, sir, are you, as a greater

25   expert in ADCC or CDC than Dr. Capon, are you?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    A    No.

2    Q    You agree that when the patents were filed there were no

3    reported experiments involving IgG fusions in which scientists

4    tested different length receptors to see what effect receptor

5    length had on effector function?

6         MR. WINTERS:  And, Bill, you can take that down.

7    Q    Do you need the question back?

11:40A  8    A    Does this refer to this publication, or could you please

9    repeat your question?

10   Q    Do you agree, sir -- so we have the Capon publication down

11   now -- that whether the patents were filed there were no

12   reported experiments involving IgG fusions in which scientists

13   tested different length receptors to see what receptor length

14   had on effector function.

15        Do you agree with that?

16   A    No.

17   Q    What publication do you have in mind?

18   A    I think Capon used different constructs, if I remember

19   correctly, where he used either all four domains of the CD4

20   receptor or just two domains.

21        MR. WINTERS:  Bill, if we could put up in that --

22   Q    Other than Dr. Capon's article that you just referenced,

23   are you aware of any other publication that looked at that

24   issue?

11:41A  25   A    I am not sure.  Maybe Traunecker.  There were variations

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1   with regards to receptor lengths, but I may agree to the extent

2   that there were no systematic investigations.

3   Q   And that's the question I'm asking, sir.  Other than the

4   Capon article, which we'll look at again in a moment, are you

5   aware of any reported experiments involving IgG fusions in

6   which scientists tested different length receptors specifically

7   to see what that different length, what effect that different

8   receptor length had on effector function?

9   A   I'm not aware of a publication that investigated this

10   specific aspect.

11   Q   The same question --

12   A   At that point in time.

13   Q   The same question with respect to antibodies.  Any reports

14   in the literature looking at varying antibody length to see

15   what effect that had on effector function?

16   A   No, I do not agree with that.  Because in the area of

17   antibodies, there were antibodies known which correspond to

18   deleted portions of full-length antibodies.  These were the

19   so-called Bence/Jones proteins or myeloma proteins, and those

20   were known at the time where part of the hinge region, for

21   example, or other parts of the antibody were shortened.

11:43A 22   Q   Let's take a look at Dr. Capon's experiments as he

23   referenced them, and just to -- let's see if we can agree on

24   something.

25          Those were IgG fusion constructs.  Correct?

 1    A    Yes.

 2    Q    They had an IgG portion and a receptor portion.   Correct?

 3    A    Yes.

 4    Q    Etanercept has an IgG portion.   Correct?

 5    A    Yes.

 6    Q    And the receptor portion.   Correct?

 7    A    Yes.

 8    Q    Let's take a look --

 9         MR. WINTERS:   Bill, if you could put up -- well,

10    before we do that.

11    Q    You mentioned in his 19 -- that his 1989 paper tested two

12    different constructs.   Correct?

13    A    I believe so.

14    Q    Okay.

15         MR. WINTERS:   Let's take a look together and we can

16    confirm for the Court.

17         Bill, could you put up JTX-58 at page 2, Figure 1 and

18    the legend.   Figure 1 is up at the top left.   Great.

19    Q    These are the constructs you referred to earlier.   Correct?

11:44A 20    A    Yes.

21    Q    And, in fact, he did look at constructs that had two

22    different lengths.   Right?   One of the constructs had only two

23    domains from the CD4, and this is in the figures at the top of

24    the document.   Right?   There's a construct there.   The last --

25    the second to the last line, there's two CD4 domains there.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    Right?

2    A    If I can help you.  Yes, exactly.  So here we see two

3    domains of the CD4 and here we see four domains of the CD4

4    receptor.

5    Q    Those were his two constructs.  Correct?

6    A    Yes.

7    Q    And they were otherwise the same with respect to the IgG

8    portion.  Correct?

9    A    That's what I understand from his presentation, yes.  I

10   mean, the individual amino acid sequences are not shown here

11   but fundamentally I would say this is correct.

12   Q    When you say the individual amino acid sequences aren't

13   shown --

14            MR. WINTERS:  Let's take a look, Bill, if we could, at

15   the legend, four lines up from the bottom.

11:45A  16            Perfect.

17   Q    In fact, Dr. Capon told the art how many amino acids were

18   in the two respective constructs.  Correct?

19   A    Yes.

20   Q    And his construct with two domains, that for the Court is

21   the construct that's depicted schematically in the line second

22   to the last, and the construct with four is depicted

23   schematically in the very last sentence.  And what Dr. Capon

24   reported was, the two-domain construct had 180 amino acids in

25   that portion of the construct.  Right?


WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    A    Yes.

2    Q    And the four-domain construct had twice that many, a little

3    over twice that many; 366 residues.  Correct?

11:46A  4    A    Yes

5    Q    And it's true, isn't it, that Dr. Capon found

6    experimentally in this publication that neither construct

7    showed steric hindrance, and that both caused an agglutination.

8    Isn't that right, sir?

9    A    I would have to have a look at the details.  I do not

10   remember whether he did all this experiments with both types of

11   constructs, or whether he did a side-by-side comparison in all

12   of his experiments.

13   Q    Let's take a look and let's make that clear, if we can for

14   the Court.

15          MR. WINTERS:  Bill, could you call out JTX-58 at 2,

16   it's the right column.  gp-120 heading, the last two sentences

17   please, and just blow that up.

18   Q    So he if says:  To confirm the bivalent nature of 2-

19   gamma-1 and 4-gamma-1 -- that's two constructs we just looked

20   at.  Correct?

11:47A 21   A    Yes.

22   Q    That's the one with two domains and the one with the four

23   domains?

24   A    Yes.

25   Q    Okay.  (Reading) We examined their ability to agglutinate

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

 1    sheep red blood cells coated with gp120.

 2         He goes on to say:  (Reading) Both CD4 immunoadhesins,

 3    but not soluble RCD-4, agglutinated the cells, showing that

 4    binding to gp120 molecules on different cells is not sterically

 5    hindered.

 6         Let me see if I can translate that into perhaps lay

 7    language and you tell me if I'm getting that wrong.

 8         What he said there, Doctor, is that he tested both of

 9    his constructs to see if they agglutinated.  Correct?

10    A    Yes.

11    Q    And one construct had in the receptor portion 180 amino

12    acids, and the other had 366.  Correct?

13    A    Yes.

14    Q    And he found that notwithstanding that those two

15    receptors -- I'm sorry.  He found that in hose constructs,

16    notwithstanding that one receptor portion was half the length

17    of the other, they both agglutinated.  Correct?

11:48A 18    A    Yes.

19    Q    Okay.  In terms of -- and "agglutination" means the ability

20    to cross-link separate molecules.  Correct?

21    A    This is the red blood cell experiment which I actually also

22    had in my presentation, and that in this case means binding to

23    two copies of gp120 molecules in a monomeric state but absorbed

24    to different red blood cells.

25    Q    And just so the record is clear, what agglutination meant

Skerra - cross - Winters

1    in this context was, his constructs were binding to two

2    separate sheep red blood cell molecules.  Correct?

3    A    Yes.

4    Q    Thank you.

5         Now let's talk about the arms of etanercept.

6         Those have, in terms of the receptor portion, 235

7    amino acids.  Correct?

8    A    Yes.

9    Q    That falls right smack in the middle of the range as

10   against what Dr. Capon tested.  Right?

11:49A 11   A    In counting the amino acids, yes, but this is not the only

12   aspect for a protein biochemist.

13   Q    Let's talk about that subject.

14        You explained in your report, Doctor, didn't you, you

15   explained why you thought an ordinary artisan at the time would

16   have expected what you call the much smaller arms of etanercept

17   to bind TNF in the same trimer.  Correct?

18   A    I think I used more properly the adjective "slim."

19   Q    Okay.  Let's take a look.

20        MR. WINTERS:  Bill, if could put up paragraph 78

21   through 80 of Dr. Skerra's report.  I think that's at page 26

22   of the PDF.

11:50A 23   Q    Now, let's just walk through at least what you told us in

24   your report.

25        So this is where you report how many amino acids the

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1   p75 TNF receptor had in the extracellular region and how many

2   amino acids the molecule you utilized had in the receptor

3   portion.  Correct?

4          MR. WINTERS:  Bill, could you bring up the next one.

5   Q   And you talked here about the ordinary artisan having had

6   expected more steric hindrance, and you give some reasons.

7   Right?

8   A   Yes.  But here talking about the FAB arms of the antibody.

9   Q   Right.

10         MR. WINTERS:  Bill, if you could bring up the last...

11  Q   And here what you said was:  (Reading) On the other hand,

12  an ordinary artisan would have expected much less steric

13  hindrance between the much smaller arms of a bivalent TNF

14  receptor fusion protein.  And you say, you go on to say:

15  (Reading) In the absence of such hindrance, two arms of the

16  bivalent TNF fusion protein could bind the two TNF molecules in

17  one TNF trimer.

11:51A  18         In summary, what you're saying there, Doctor, is that

19  because -- and I'll use your words -- the etanercept molecule

20  you were looking at had much smaller arms, the ordinary artisan

21  would expect those two smaller arms to bind one TNF trimer

22  rather than two separate molecules.  In summary, that's what

23  you're communicating there?

24  A   Yes.  Small, but in terms of spatial dimensions.  And this

25  is why I also used the term "slim," compared with bulky arms of

1      a FAB fragment.

2      Q    Right.  And in terms of the amino acid length of etanercept

3      as compared to the amino acid length of the constructs Dr.

4      Capon analyzed, etanercept falls right smack in the middle.

5      Right?

6      A    May I clarify a point, please?

7      Q    I would prefer you just answer my question, if you could.

8            In terms of the number of amino acids in the

9      constructs Dr. Capon assessed as against the number of amino

10     acids actually in etanercept, that's right in the middle.

11     Isn't that right?

11:52A 12   A    In terms of the number, yes.

13     Q    Okay.

14            MR. WINTERS:  Give me one second, Doctor.

15            May I have just one second?

16            THE COURT:  Certainly.

17            (There is a pause for Mr. Winters.)

11:55A 18   Q    We're going to find something, Doctor.  I'm going to move

19     on to a different --

20            THE COURT:  Do you want to take a few minutes?

21            MR. WINTERS:  We'll come back to it.  Thank you, your

22     Honor, I appreciate that.

23            THE COURT:  Okay.

24     BY MR. WINTERS:

25     Q    We've been talking about, Doctor, your opinions about

Skerra - Cross - Winters

1    etanercept binding to a single TNF trimer.  Let's talk about

2    that trimer.

3             Would you agree that in August of 1990, the

4    three-dimensional shape of the extracellular region of the p75

5    TNF protein -- withdraw that.

6             In terms of the p75 TNF receptor portion of this

7    invention, would you agree that at the time of the invention

8    the three-dimensional shape of the receptor portion of

9    etanercept had not been determined by exray crystallography?

11:56A 10   A   That's my understanding, yes.

11   Q   Would you agree that at that point, what was known about

12   the p75 TNF receptor portion of this invention was the amino

13   acid sequence?

14   A   Actually the nucleotide sequence, the DNA sequence, and the

15   amino acid sequence was determined by inference from the DNA

16   sequence, yes

17   Q   And you've been talking about the nature of TNF receptor

18   binding and TNF-binding.  Had the precise nature of that

19   binding been determined by exray crystallography by August of

20   1990?

21   A   No.

22   Q   Had the amino acids in the extracellular region of the p75

23   TNF receptor, in terms of where that binding occurs, had that

24   been experimentally confirmed as of August 1990?

11:57A 25   A   Not that I know of.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skerra - Cross - Winters

1    Q    An antibody binds to an antigen by binding to a specific

2    region on the antigen called an epitope.   Correct?

3    A    Yes.

4    Q    And would you agree that at the time of the patents, the

5    ordinary artisan would have expected that antibodies that bind

6    to TNF trimers, so antibodies now that bind to TNF trimers,

7    would tend to aggregate?

8    A    No.   The default assumption would have been that the

9    antibodies would have taken advantage of the avidity effect and

10   form a one-to-one complex, that would have been the default

11   assumption unless one would, let's say, further think about it.

12         MR. WINTERS:   Could we have, please, Dr. Skerra's

13   report at page 26 of the PDF, paragraph 79, the last sentence.

14   Q    Isn't that what you're communicating here, Doctor?

11:58A 15   A    Yes, and that's what I also presented in my presentation.

16   Q    I'm sorry?

17   A    That's what I also explained in my presentation.

18   Q    So you'd agree then that it was known in the art at the

19   time that antibodies that bind to TNF trimers would tend to

20   aggregate.   Fair?

21   A    No, at the time those antibodies were not known.

22   Q    I'm sorry?

23   A    The antibodies only became known much later.

24   Q    Could you read, please, into the record the sentence we've

25   highlighted?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skerra - Cross - Winters

```
        1    A    (Reading) The cross-linking of two TNF trimers via one
        2    antibody molecule further leads to formation of large antibody
        3    TNF trimer aggregates (complexes).
        4    Q    And that's still your testimony?
        5    A    Yes.
        6    Q    By the way, you used an analogy or metaphor -- I can never
        7    keep the difference between those straight -- but earlier you
        8    talked about if you had a box you were trying to lift.
11:59A  9    A    Yes.
       10    Q    And you grabbed one side of the box, your other arm would
       11    grab the other side of the box.  Do you recall that?
       12    A    I grabbed the handles, yes.
       13    Q    Right.
       14    A    And the handles would be the epitopes.
       15    Q    Right.  So in terms of what was known at the time, in terms
       16    of how a bivalent protein bound its target, that's too left
       17    hands.  Right?  Not a left and a right.
       18    A    But the handles do not distinguish left or right-hand.
       19    Q    Okay.  Let's just take this step-by-step.
       20    A    Yes.
       21    Q    At the time the bivalent protein molecule would have had
       22    two left hands, not a left and at right.  Correct?
       23    A    Of course the analogy has its limitations, correct.
       24    Q    And in terms of what was known at the time with respect to
       25    how etanercept could have been expected to bind to its target
```

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skerra - Cross - Winters

1    trimers, to its target TNF -- well, withdraw that.  Let me take

2    it out of that context.

12:01P  3         In terms of how a TNF receptor bound to TNF -- and now

4    we're on the same page with the two left hands -- the precise

5    binding site in the trimer and TNF, that had not been

6    determined.  Correct?

7    A   No, it was not determined.

8    Q   And the precise place along the TNF receptor that bound to

9    the TNF trimer, that hadn't been determined either.  Correct?

10   A   I agree.

11   Q   And the shape of that, you had talked about grabbing a box.

12   The shape of that binding, that had not been determined either,

13   correct, the confirmation?

14   A   The shape of the TNF trimer was known, but of course it was

15   not known what is the precise shape of the receptor for it.  So

16   that piece of information was missing.

17   Q   Right.  And it wasn't known where -- it wasn't known

18   precisely where along the TNF receptor that binding occurred.

19   Right?

12:02P 20   A   That's what I said before, yes.

21   Q   Okay.  Would you agree that at the time of the patents, it

22   was known that each arm of an antibody bound to an epitope on

23   one TNF molecule on two different TNF trimers?

24   A   I do not think so because the antibodies were not known at

25   the time.

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

        1            MR. WINTERS:  Why don't we take a look, if we could,

        2      please, at Dr. Skerra's report, PDF page 26, paragraph 79.

        3      Q   And you say, there's a sentence in the middle, Doctor --

        4            MR. WINTERS:  Could you highlight that, Bill,

        5      "Therefore, one..."

12:03P  6      Q   Would you read that sentence into the record, sir?

        7      A   (Reading) Therefore, one FAB arm of the antibody would be

        8      free to bind to another TNF molecule in another TNF trimer,

        9      cross-linking two TNF trimers.

       10      Q   And the cross-linking you're referring to there, that's

       11      like the agglutination we saw earlier in the sense that one arm

       12      of the bivalent protein is binding one target and the other arm

       13      is binding another target.  Right?

       14      A   The agglutination we talked about before referred to cells.

       15      Here we are talking about protein molecules.  Here I would call

       16      it aggregation.

       17      Q   Okay.  But in terms of the way the arms are binding, what

       18      you're communicating here is that one arm of the bivalent

       19      protein is binding one target, and the other arm of the

       20      bivalent protein is binding the same kind of target, but just a

       21      different one.  Correct?

       22      A   Yes, it's the Mode 1 which I referred to in my

       23      presentation, yes.

12:04P  24      Q   And this is still your testimony.  Yes?

       25      A   Yes.

                    WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1    Q    Would you agree that there are, as a matter of theory,

2    three different kinds of modes of binding?

3    A    That's the way how the expert, Dr. Naismith, presented it.

4    I mean, if I would think about it I may even envisage more

5    modes of binding, but I think I could agree to Dr. Naismith's

6    view and the principle existence of these three modes of

7    binding.

8    Q    And at the time it was known that antibodies bound in mode

9    one.  Correct?

10   A    Under certain circumstances.

11          MR. WINTERS:  Could we have, please, Dr. Skerra's

12   report at page 18, paragraph 63.  And there's a sentence that

13   that begins about halfway down:  "Due to this steric hindrance,

14   one antigen binding site of the antibody would remain free to

15   bind to another TNF trimer, which leads to cross-linking of two

16   TNF trimers."

12:05P 17   Q    You're describing mode one binding there.  Correct?

18   A    Yes.

19   Q    And that was known at the time by the ordinary artisan.

20   Correct?

21   A    That it can happen.  It was known, yes.

22   Q    And that, in fact, for antibodies it was known that that

23   was typically what antibodies did.  Fair?

24   A    No, I don't think so, because for antibodies the avidity

25   effect was known.  So that means if the antibody has the chance

1      to bind epitopes on one and the same particle, it would do so,

2      because this also was explained in Dr. Roitt's textbook and

3      that was the general expectation at the time.

4      Q   And you just explained here --

5          MR. WINTERS:  Bill, back up on the slide, back up on

6      the screen.  DDX-3024.

12:06P  7   Q   This is the Crothers article from 1972.  Correct?

8      A   Yes.

9      Q   And you discussed the sentence highlighted in yellow there.

10     That reported a theoretical conclusion.  Correct?

11     A   Based on experimental evidence which was referenced in this

12     publication.

13     Q   Okay.

14         MR. WINTERS:  And if you could move that up, Bill.

15         I would like to focus on a sentence that I don't think

16     you discussed.

17         Bill, if you could highlight the next sentence.

18     Q   Could you read that sentence, Doctor, into the record?

19     A   Certainly.  (Reading) That the opposite appears sometimes

20     to be experimentally the case means that special features

21     favoring agglutination reactions must be present in these

22     instances.

23         This is what Crothers and Metzger say.

24     Q   And what you're referring to there is the behavior of

25     antibodies.  Correct?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skefra - cross - Winters

```
          1    A    No, not exactly.  They referring to the exception.
12:07P    2    Q    We'll talk about whether that's the exception.  But the
          3    experiments they're referring to there are experiments
          4    involving antibodies.  Correct?
          5    A    But in their first sentence they also referring to
          6    antibodies.
          7    Q    The experiments that they're referring to there concern
          8    antibodies.  Correct?
          9    A    Yes.  Yes.
         10    Q    And it was correct, was it not at the time, that in terms
         11    of experimental results involving antibodies, they normally
         12    reflected agglutination or aggregation.  Correct?
         13    A    No.
         14    Q    That was not known at the time by the ordinary artisan,
         15    wasn't it?
         16    A    No.
         17    Q    What publication or publications, if any, did you have, do
         18    you have in mind when you say "no"?
         19    A    I think we can just use this publication and go five pages
         20    further down where Crothers and Metska quote to experimental
         21    studies which they can perfectly explain that theory.
12:08P   22    Q    We will return to that then.
         23         In terms of the three theoretical modes of binding, a
         24    consequence of Mode 1 binding is aggregation.  Correct?
         25    A    Yes.
```

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skefra - Cross - Winters

1    Q   And antibodies have a Y-shape.  Yes?

2    A   Fundamentally, yes.

3    Q   With binding sites on each arm of the Y?

4    A   At each tip of the Y actually.

5    Q   Yes?

6    A   Yes.

7    Q   Etanercept also has a Y-shape.  Correct?

8    A   Yes.

9    Q   With binding sites on each arm of the Y?

10   A   Yes.

11   Q   Would you agree that as of August 1990, there were no

12   reported experiments showing that TNF receptor IgG fusions

13   would behave differently than an antibody and not cause

14   aggregation?

15   A   Yes.

16   Q   As of August 1990, the positioning of etanercept's arms in

17   relation to TNF trimers was not known.  Correct?

12:09P 18   A   Yes.

19   Q   There was, however, publicly available data on the effector

20   function reported in the CD4 IgG fusion protein art.  Correct?

21   A   Some information, yes.

22   Q   And Dr. Capon's 1989 article talked about that.  Yes?

23   A   Yes.

24   Q   And the Traunecker article talked about that.  Correct?

25   A   Yes.

Skerra - cross - Winters

```
     1   Q   And the Byrn article talked about that.  Correct?

     2   A   Which one?

     3   Q   Byrn 1990.

     4   A   I'm not sure whether I had a closer look at this article.

     5   Q   Okay.  Maybe we can -- you're not -- as you sit here you

     6   don't think you're familiar with that article?

     7   A   No.

     8   Q   How about the Gregorson (phonetic) article.  Are you

     9   familiar with that?

    10   A   Which year?

    11   Q   Gregorson?

    12   A   Which year.

    13   Q   I think that's 1990.

    14   A   I think, yes, I'm familiar with that article, I believe so.

    15   Q   And would you agree that the ordinary artisan would have

    16   understood in the aggregate that art to teach that if you

    17   retain the IgG1 component hinge-CH2-CH3, one should expect that

    18   construct to have -- you know, to show CDC and ADCC?
```

12:10P   19   A   No.

```
    20   Q   You don't think that's a fair summary of that art?

    21   A   I don't think so.

    22   Q   Which of those four articles disproves that in your view?

    23   A   I think the experimental evidence given in those articles

    24   was incomplete.  I mean, what was to be deduced from this

    25   articles was that the Fc portion of the fusion protein would
```

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

| | |
|---|---|
| | 1 |
| | 2 |

1    have binding activity to the Fc receptor, and that it would

2    also in principle have binding activity even though to low C1q,

3    but this condition alone is not sufficient to elicit CDC or

4    ADCC because it is necessary to have these high molecular

5    weight or higher order aggregates in order to elicit the

6    cellular response of the ADCC or the complement response which

7    is the CDC.  So the mere binding affinity is not sufficient.

12:11P  8    MR. WINTERS:  Why don't we, if we could, look at

9    JTX-56, that's Byrn article at the abstracts.

10    And there's a sentence that begins -- yeah, perfect.

11    "Here we show..."  Exactly.

12    Bill, could you just highlight that to the end of the

13    sentence.

14    Thanks.  All way to "Their surface..."

15    Q   In fact, Doctor, didn't this Byrn publication show with

16    experimental evidence that their CD4 IgG fusion construct

17    actually demonstrated ADCC?

12:13P  18    A   In the case of a membrane-bound antigen, gp120 on the

19    surface of HIV infected cells, I agree.

20    Q   And we've looked at Dr. Capon's 1989 article.  You'll agree

21    that he expressed in that article the expectation that his

22    construct would both bind C1q -- you agree with that.  Right?

23    A   Yes.

24    Q   And that it would show Fc receptor binding.  Correct?

25    A   Yes.

Skefra - Cross - Winters

1    Q   And the binding of C1q is the first step that leads to --

2    is an early step that leads to CDC.  Correct?

3    A   It can lead to CDC, yes.

4    Q   And the Fc receptor binding is an early step that can lead

5    to ADCC.  Correct?

6    A   Yes.

7    Q   And how about the Gregerson article; would you agree that

8    that article proved that an IgG CD4 construct actually

9    demonstrated ADCC and CDC?  Would you agree with that?

12:14P 10   A   In the context of HIV-infected cells.

11   Q   Was that a "yes"?

12   A   Yes.

13   Q   Okay.  And this is my last question before we turn subjects

14   in case the Court has a lunch preference.  But would you agree

15   that at the time of the patents, there was not a single prior

16   art reference that tested an IgG fusion protein for effector

17   functions and demonstrated experimentally that there were none?

18   A   Could you please repeat the question?

19   Q   Yes.  Would you agree that at the time of the patents,

20   there's not a single prior art reference that tested an IgG

21   fusion construct for effector functions and found that it did

22   not have any?

23   A   Didn't we just talk about the Capon paper where those

24   effector functions were not detected in some of the

25   experiments?

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

Skefra - Cross - Winters

```
         1    Q    You're talking about Capon 1989?

12:15P   2    A    Yes.

         3    Q    And his construct had a CH1.  Correct?

         4    A    Yes.

         5    Q    I may have talked over you.  His construct retained the CH1

         6    region.  Correct?

         7    A    I guess so, yes.

         8    Q    And etanercept does not have a CH1 region, does it not?

         9    A    Not to my knowledge.

        10    Q    So with your help I'll ask perhaps a better question.

        11    A    Okay.

        12    Q    Would you agree that at the time of the patents, there was

        13    not a single prior art reference that tested an IgG fusion

        14    construct that had the following part of IgG:  Hinge-CH2 and

        15    CH3, and demonstrated experimentally that there was no effector

        16    function?

        17    A    Yes.

        18              MR. WINTERS:  If this is a logical time for the Court

        19    to have lunch, or I can keep going.

        20              THE COURT:  Hold on one moment, let me just check.

        21              That would be a fine time to break.

        22              Let's take our lunch break at this point.  You may

        23    step down.  Be mindful.

        24              And we'll see you back here in an hour.  Thank you.

12:16P  25              THE DEPUTY CLERK:  All rise.
```

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ

1                    (Witness temporarily excused.)

2                    (A luncheon recess is taken.)

3                    (The PM Session of this day's proceedings is found in

4        a separate transcript booklet.)

5                              ooOoo

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

WALTER J. PERELLI, CCR, CRR, OFFICIAL COURT REPORTER, NEWARK, NJ